## Case No. 15,815.

### UNITED STATES v. MORRIS.

[1 Curt. 23; 9 West. Law J. 151; 2 Liv. Law Mag. 277; 4 Am. Law J. (N. S.) 241.] [1]

Circuit Court. D. Massachusetts. Oct. Term, 1851.

CRIMINAL LAW—JURY—OF WHAT JUDGES—PLEA IN BAR—CHALLENGE—CIRCUIT COURT—SLAVERY.

1. Under the constitution and laws of the United States, the jury are not the judges of the law in a trial for a crime; they are to take the law from the court, and apply it to the facts which they may find from the evidence, and thus frame their general verdict, of guilty or not guilty.

[Cited in U. S. v. Rycraft, Case No. 16,211. Followed in U. S. v. Riley, Id. 16,164; Sparf v. U. S., 15 Sup. Ct. 282, 156 U. S. 74.]

[Cited in Com. v. Anthes, 5 Gray, 237; Rice v. Thayer, 105 Mass. 261; State v. Wright, 53 Me. 334; State v. Hodge, 50 N. H. 522; Copp v. Henniker, 55 N. H. 198; Com. v. McManus, 143 Pa. 97, 22 Atl. 765. Quoted in State v. Burpee, 65 Vt. 22, 25 Atl. 970.]

2. Under the act of congress of August 8, 1846, (9 Stat. 73, § 3,) an indictment for a misdemeanor may be remitted to this court by an order made at a term subsequent to that to which the indictment is returned, and after the defendant has pleaded, and some proceedings have been had.

[Cited in U. S. v. Riley, Case No. 16,164; U. S. v. Haynes, 29 Fed. 694.]

[Cited in Lapham v. Almy, 13 Allen, 305.]

3. It is not a good plea, in bar to an indictment for a misdemeanor, that the case was once committed to a jury, and withdrawn before verdict by order of the court.

4. Though neither party has a right of challenge after a juror is sworn, it is in the discretion of the court to protect the administration of justice, by investigating, at any stage of the trial, an objection to the impartiality of a jury, and by withdrawing the case from the jury, if any juror is found unfit to sit therein.

[Cited in U. S. v. Riley, Case No. 16,164; Simmons v. U. S., 12 Sup. Ct. 172, 142 U. S. 148.]

[Cited in People v. Wintermute, 1 Dak. 63, 46 N. W. 700. Cited in brief in Ochs v. People, 124 Ill. 405, 16 N. E. 662. Cited in Com. v. McCormick, 130 Mass. 62. Quoted in State v. Ulrich, 110 Mo. 359, 19 S. W. 658.]

5. The question, whether a person was held to service under the laws of Virginia is partly a question of status, and partly a question of property; and in either aspect, evidence that the person was, in point of fact, held and treated as a slave in Virginia, is admissible, and if not controlled, sufficient evidence to require the jury to find that he was held to service under the laws of that state.

An indictment for a misdemeanor was found against the defendant, and returned into the district court [case unreported],

---

[1] [Reported by Hon. B. R. Curtis, Circuit Justice. 2 Liv. Law Mag. 277, and 4 Am. Law J. (N. S.) 241, contain only partial reports.]

which, having been removed to this court, the defendant filed the following plea:

"Special Plea.—And now the defendant, after the reading of the indictment, says, that the same indictment was returned by the grand jury of the United States to the district court of the United States for this district, at the March term thereof, last past; that he appeared before said court, and was duly arraigned to answer to said indictment, at said term, and did plead thereto the plea of not guilty; that, thereupon, a jury of twelve men was impanelled to try the issue between him and the United States; that each juror answered, under oath, that he was sensible of no bias, and entertained no opinion which would prevent his finding a verdict against the defendant, if the law and the evidence required it; that the case was opened to the jury by the counsel for the United States, and witnesses were examined in behalf of the prosecution; that, thereupon, the district attorney moved the court, that he might be permitted to introduce evidence tending to show that one of the jurors had a bias in the case; that the defendant objected to the right of the court to hear the evidence, but it was allowed, and several witnesses were examined as to the declarations of the juror, and the court ordered the juror to be withdrawn, and the case to be continued to the next term of said court, without the consent of the defendant, and without any necessity for so doing; that at the next term of the said court, to wit, the June term, last past, the judge of said court ordered the indictment to be remitted to this court, by an entry on the docket, that, in the opinion of the court, difficult and important questions of law were involved in the case, and it was so remitted; that no other matters or things were remitted to this court, except the indictment and recognizances; and none of the proceedings in said court were remitted to this court, or appear on record, or on the files of this court. Wherefore, the defendant says, that he ought not to be required to plead to this indictment; and that he ought not to be tried upon this indictment; and that this court ought not to take further cognizance of this indictment. And he prays the judgment of the court in the premises. Robert Morris."

To this plea there was a general demurrer, and joinder in demurrer.

The District Attorney and N. J. Lord, for the United States.

J. P. Hale and R. H. Dana, Jr., for the prisoner.

CURTIS, Circuit Justice. The first point raised by this plea is, whether this indictment has been lawfully remitted to this court, and is now regularly pending here. It is alleged that the district court had not power, under the act of 1846, c. 98, § 3, to remit the indictment to this court, for several reasons, the first of which is, that the order to remit was not made at the term when the indictment was presented. The clause of the statute under which the district court acted is as follows:—"And the said district court may, moreover, in like manner, remit to the circuit court any indictment pending in said district court, when, in the opinion of the court, difficult and important questions of law are involved in the case; and the proceedings thereupon shall thereafter be the same in the circuit court, as if such indictment had been originally found and presented therein." It is argued that the direction to remit "in like manner," refers to the manner of remitting capital indictments, provided for just before, in the same section. Of this there can be no doubt. It is further argued, that the "like manner" includes a direction to remit to the next term of the circuit court, because capital indictments are to be remitted to the next term of that court. If it were admitted, that the authority to remit "in like manner" is an authority to remit to the next term of the circuit court, it would not follow that the remission must be to the term of the circuit court next following the presentment of the indictment in the district court.

The question would still remain, whether the order to remit must be made at the term at which the indictment is presented. The time when such order is to be entered may or may not be considered as part of the "manner" of remitting. Generally, the time of doing an act and the manner of doing an act are distinct things. The phrase, "at such times and in such manner," is one of very frequent occurrence in legal language, and is strictly correct. Still, it may be that, though not naturally included, congress intended to embrace the time of entering the order in the words "in like manner;" and therefore it is necessary to look carefully at the different parts of this statute, and see if such was the intention of congress. When the remission of capital indictments is provided for, the act says, "every indictment for a capital offence presented to the district court, shall, by order entered on the minutes of the court, be remitted," &c. It is not intended that such indictment shall, in a legal sense, be pending in that court which has not power to try them; they are to be presented and then remitted, and the inference is a necessary one, that the order to remit is to be made when presented. But by the clause under consideration, the court has power to remit any indictment pending in that court; from which no such inference, but the contrary, is to be drawn; for indictments are pending only after they are presented, and their pendency continues till finally disposed of. It would seem, therefore, that the words "in like manner" were not intended to embrace the time when the

order is to be entered; for in one case it is to be when the indictment is presented, in the other while it is pending. If we look further at the subject-matter of the enactment, we find that the statute says, any indictment pending in the district court may be remitted, "when, in the opinion of the court, difficult and important questions of law are involved in the case."

The natural meaning of this is, that the order may be made when the court shall have arrived at the opinion that such questions are involved in the case, and if so, there is no limit of time. When that opinion is formed the time is come, according to the statute, to make the order; till it is formed, the time has not come; and whether formed at the first, or any subsequent term, it is equally a compliance with the statute to enter the order.

But it is also contended, that this order must be made before any proceedings have taken place under the indictment, and that to allow a remission after any proceedings would endanger the prisoner's rights, and could not have been intended by congress. It is undoubtedly true that, to deprive a prisoner on trial for a crime of any substantial right, is so contrary to the general system of our law, that the legislative intention must be expressed with great clearness to induce the court to suppose that such was the design. But if, on the contrary, very important rights are secured; if the provision is in harmony with other modes of proceeding, which have been long in use and generally approved; and if the worst that can be imagined is not the loss of any right, but merely some danger of inconvenience in some possible cases, it would be going too far for the court to put a constrained interpretation upon the law, and deny to it its full meaning.

It has already been stated, that the natural meaning of this clause is, that the order to remit is to be made when the court has arrived at the opinion that difficult and important questions of law are involved in the case, and that the act prescribes no limit of time within which such opinion is to be formed. It may be added, that it is a fair, not to say a necessary inference, from the fact, that the remission is to be made as a consequence of the opinion that difficult and important questions of law are involved in the case; that such proceedings are to take place, as in the ordinary course of things are usually necessary to enable the court to form such an opinion, and these would certainly include some judicial investigation of the merits of the particular case, or, if there is a class of cases, of some one of them. It is suggested that the court may examine the indictment, and thus ascertain that important and difficult questions of law are involved; but the act does not confine the questions to the indictment; its language is, "questions involved in the case." Besides, it is no part of the duty of the court, or of its ordinary action, and can scarcely be considered judicial, for the court to inspect indictments to foresee what questions may be raised; and congress cannot be supposed to have legislated for a class of cases to arise out of the formation, by the court, of an opinion, in a way which is entirely out of the usual course of judicial action, and which cases, therefore, could not justly be expected to arise at all. The sound construction of the clause is, that this opinion is to be arrived at, as other judicial opinions are, in the usual course of justice, after an issue is made, and the parties so far heard as to develop the questions which exist. The argument of the defendant's counsel proceeds upon the basis that there are to be no proceedings in the district court, and this assumption is necessary; for if it be conceded that the accused is to be arraigned and plead, the whole basis of the argument must fail. But if there has been no plea, how can the court know that any question whatever is to arise. The defendant may plead guilty, and so there may be no questions at all.

It is suggested, however, that the construction contended for by the defendant ought to be adopted, because any other affects the rights of the accused, and this is in two ways. First, it is urged that the district judge may arbitrarily break off a trial after it has begun, and send the case to another court, perhaps for the very purpose of embarrassing the accused; though any intention of imputing such motive in this case is wholly disavowed. Taking a practical view of this argument, it would seem that a defendant would not be unwilling to get out of a court held by a single judge, who manifested a disposition to oppress him, and whose rulings there is no means whatever of revising; that a judge who had such a disposition would be far more likely to keep the control of the case than to send it to another court. And, taking a legal view of the subject, it is clear that no argument can be drawn from the amount of discretionary authority thus conferred on the judge, because it is in harmony with other provisions of law, and of this very statute, and of the same nature as the powers already possessed by courts of the United States. By the act of 1792 (chapter 66) it is provided, that when the judges of the circuit court are divided in opinion, the question may be certified to the supreme court for decision, and the trial is to proceed or to be broken off, as the court shall determine. Here there is a discretion vested in the court to stop the trial or not, as they shall think the merits of the case require, and that for a reason not unlike the one on which the judge is to act, under the clause of the statute now in question.

In all cases within the jurisdiction of the district court, it is in the power of that court, as it is in the power of the circuit court, even in capital cases, to take the case from

a jury impanelled to try it, whenever, in the opinion of the court, it is necessary, or required by the interests of public justice to do so. The authorities in support of this position will be presently referred to; and although they show that, especially in capital cases, it is a power to be exercised with great caution, yet it exists, and is purely and entirely dependent upon the discretion of the court; and, by the second section of this very act, the district court is empowered, on the motion of the district attorney, to remit to this court an indictment and the proceedings under it, as a mere matter of convenience, and when no questions of difficulty and importance are involved. It seems to me, therefore, not improbable that congress intended to intrust the district court with a similar discretion, to be exercised upon this class of cases;—where, difficult and important questions of law being involved, there is a moral necessity, and the interests of public justice may require that they should go into a higher court, when, if they prove to be so difficult that a real difference of opinion exists between the two judges, they may be sent to the supreme court for a final decision. It is apparent that the prisoner may find great additional security for his rights by this course; and, considering that it is only recently that any criminal jurisdiction was intrusted to the district court, that it now has an entire criminal jurisdiction except in capital cases, that there is no mode whatever of revising its decisions and giving uniformity to them throughout the country, and that congress has by this law intended to make a provision to prevent what might otherwise prove to be a serious mischief, I do not feel at liberty to hold that the law shall apply only to cases where no proceedings have been had, which would in effect render it practically almost inoperative, and shall not apply to cases quæ frequentius accidunt, where the questions have been developed, as questions ordinarily are developed, by hearing the parties upon a formed issue.

It is urged, however, in the second place, that, inasmuch as under this section no proceedings subsequent to the indictment are to come up to the circuit court, it must be supposed that it was intended that no cases should come up in which any proceedings had been had, and that the accused may be injured by having the indictment transferred without the proceedings. This argument is entitled to weight, but it is far from being conclusive. It may well be that congress intended that a case remitted to the circuit court, because it involved questions of law so important and difficult, that the interests of public justice and the rights of the immediate parties required that court not to try and determine it, should be tried in the circuit court de novo from the beginning; this might be an advantage to the prisoner, for it gives him an opportunity to plead anew. But it is suggested that it may, in some cases,

be injurious to him, because there may be something on the record below of which he could avail himself by motion, but if the proceedings below do not come up he must plead the matter specially, and thus not only be put in jeopardy of failing upon some technical point, but subjected to a final judgment if he should fail. But, under the laws of the United States, I know of only one matter which must be pleaded specially; that is, a former acquittal or conviction for the same offence; everything else may be given in evidence under the general issue. But if the defendant has been acquitted in the district court, the indictment is no longer pending there, and so cannot be remitted here; and if it were to be so remitted, the court would, upon motion and production of the record of the district court, dismiss it; the defendant would not be put to plead at all. The court has gone much further than this in U. S. v. Collidge [Case No. 14,858]. And if the defendant were convicted in the district court, and the case were one in which a new trial can be had, the defendant can have no cause to complain that he gets one by having the case certified here; and if no new trial can be had in a case of felony, upon which I give no opinion, then the defendant has only to move to dismiss, as in case of acquittal, and he must be discharged.

Lest I should be thought to have overlooked this particular case, in what I have said concerning the necessity of pleading specially, I observe that the subject-matter of this plea could not have been availed of in the district court on motion, any more than here, because the gist of the plea, as put forward by the defendant's counsel, consists of matter of fact not apparent on the record there, viz., that the juror was withdrawn after he had been examined on the voir dire, for a cause of challenge not arising subsequent to the impanelling of a jury, the defendant objecting, and that the case was taken from the jury without necessity. Whatever averments the plea contains as to these matters, would be just as much dehors the record in that court as in this, and of course would have been so in this court if the whole record had come up. I am of opinion, therefore, that the natural meaning of the language of this third section empowers the district court to remit to this court an indictment pending therein at a term subsequent to that when presented, and after any proceedings have been had therein which do not amount to a bar to a future trial; that the subject-matter of the act does not call for a restricted interpretation of its language, and that, therefore, this indictment was properly remitted here, unless the matters contained in the plea amount to a bar to another trial.

Considered as a plea in bar, its substance, as understood by the defendant's counsel, is, that this indictment for a misdemeanor, having been committed to a jury impanelled to try it, was, by order of the court, taken from

this jury, and the case continued without necessity; and that, before this was done, a juror, who had been examined on the voir dire, as to his standing indifferent, and who had so answered that he was sworn and sat on the panel, was withdrawn, by order of the court, upon proof of bias. Supposing this to be just as the defendant's counsel understands it, I should feel it to be quite impossible to come to the conclusion that the plea is a good bar. I know of no authority for the position that, because a trial for misdemeanor has been broken off in a manner which the defendant avers, and offers to prove to the satisfaction of another court, was irregular, therefore there can be no further trial. But I do not pause upon this, because I think it clear that when this plea is examined it fails to show any irregularity in the proceedings of the district court.

The defects alleged consist, first, in withdrawing a juror, and second, in ordering the case to be continued. As to the first, it is contended that the common law does not allow a juror to be challenged after he is sworn, except for causes arising after he is sworn; that here the juror was examined on the voir dire as to his bias, was sworn, and then challenged, and evidence of bias allowed to be given, and that this was necessarily the same cause of challenge inquired into on the voir dire; that bias is a state of mind, and so the evidence must necessarily have applied to the cause of challenge existing when the juror was sworn. It must be admitted that bias is a state of mind, but it does not necessarily follow that the evidence applied to a cause of challenge existing when the juror was sworn. This assumes that the mind cannot change its state or be changed, and that because the juror stood indifferent when he was sworn, he could not become biased afterwards, which is evidently untrue. There is no averment in this plea that the cause of challenge existed when the juror was sworn. nor that the evidence in support of it related to the state of mind of the juror before he was sworn, and, consequently, upon the rule of the common law, as understood by the defendant's counsel, the plea is bad in this particular. It is not known to me what is the truth of the case, or whether, consistently with the truth, the plea could be amended; but as I have a clear opinion upon the merits of this part of the plea, wholly independent of this defect in it, I think it proper to express it.

The rule of the common law, as shown by the authorities cited by the defendant's counsel, is, that neither party has a right of challenge, after the juror is sworn, for cause then existing. But it by no means follows that it is not in the power of the court, at the suggestion of one of the parties, or upon its own motion, to interpose and withdraw from the panel a juror utterly unfit, in the apprehension of every honest man, to remain there. Suppose a prisoner on trial for his life should inform the court that a juror had been bribed to convict him—that the fact was unknown to him when the juror was sworn, and that he had just obtained plenary evidence of it, which he was ready to lay before the court, is the court compelled to go on with the trial? Suppose the judge, during the trial, obtains, by accident, personal knowledge that one of the jurors is determined to acquit or convict without any regard to the law or the evidence, is he bound to hold his peace? In my judgment, such a doctrine would be as wide of the common law as it would be of common sense and common honesty. The truth is, that this rule, like a great many other rules, is for the orderly conduct of business. There must be some prescribed order for the parties to make their challenges, as well as to do almost every thing else in the course of a trial. As matter of right, neither party can deviate from this order. And it is the duty of the court to enforce these rules, which are for the general good, even if they occasion inconvenience and loss in particular cases. But there goes along with all of them the great principle, that being designed to promote the ends of justice, they shall not be used utterly to subvert and defeat it; being intended as a fence against disorder, they shall not be turned into a snare; they do not tie the hands of the court, so that when, in the sound discretion of the court, the public justice plainly requires its interposition, it may not interpose; and it would be as inconsistent with authority as with the great interests of the community, to hold the court restrained.

A very eminent English judge has treated this rule concerning challenges just as I believe it should be treated. Chief Justice Abbott says: "I have no doubt that if, from inadvertence, or any other cause, the prisoner or his counsel should have omitted to make the challenge at the proper moment, the strictness of the rule which confines him to make the challenge before the officer begins to administer the oath, would not be insisted on by the attorney-general, or, if insisted on by him, would not be allowed by the court. Derby Case, Joy, Conf. 220." That is, like other rules of procedure in trials, it is in the power of the court to dispense with it when justice requires. But the interposition of the court may be placed on even higher ground, supported by authority which in this court is decisive. In U. S. v. Percy, 9 Wheat. [22 U. S.] 579, the question came before the supreme court, whether it was in the power of the circuit court to discharge a jury in a capital case, and afterwards put the prisoner on trial by another jury. The distinction between capital cases and misdemeanors, under the provision of the constitution of the United States, cited by the defendant's counsel, is very plain; yet, speaking even of capital cases, the court says: "We think that, in all cases of this nature. the law has invested courts of justice with authority to discharge a jury from giving any verdict, whenever, in

their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject, and it is impossible to define all the circumstances which would render it proper to interfere." That a court would interfere far more readily in a case of misdemeanor there can be no doubt, and it is so asserted in terms by Story, J., in U. S. v. Coolidge [Case No. 14,858]. In U. S. v. Shoemaker [Id. 16,-279], and U. S. v. Gibert [Id. 15,204], it will be found that Justices Washington, Story, and McLean, have all acted in their circuits upon these principles. Now, if the court has such a discretion; and if, as the supreme court say, it is to be exercised even in capital cases, where the ends of public justice would otherwise be defeated, what case can be imagined more fit for its interposition than one where the court finds that a juror is so biased, either against the prisoner or the government, that he is unfit to sit in the cause? The truth is, that it is an entire mistake to confound this discretionary authority of the court, to protect one part of the tribunal from corruption or prejudice, with the right of challenge allowed to a party. And it is, at least, equally a mistake to suppose that, in a court of justice, either party can have a vested right to a corrupt or prejudiced juror, who is not fit to sit in judgment in the case. I hazard nothing in saying, that no such right is known to the common law. This disposes of the other allegation in the plea, that the case was taken from the jury and continued without necessity, for, in the language of the supreme court, already cited, if there is no necessity, strictly speaking, yet if, in the opinion of the court, taking all the circumstances into consideration, the ends of public justice would otherwise be defeated, then even a capital case may be taken from a jury, and à fortiori may be a case of misdemeanor.

There is no allegation in this plea, that it did not so appear to the court; and if there were, or even if an absolute necessity ought to have appeared to the court, how can a party be allowed to aver the contrary? The finding of a cause for withdrawing a juror, or taking a case from the jury, is a judicial act; the authority to do it is intrusted by law to that court, and no other court can revise its decision. Suppose the allegation in this plea, that the case was taken from the jury without necessity, had been traversed, and the issue put to the jury; the substance of their finding must be that, in their judgment, there was no necessity. But their judgment has nothing to do with the matter. They are not the tribunal to judge of the existence of the necessity; and, therefore, their finding would be wholly immaterial, even if the party was not estopped, as he clearly is, from averring, that a judicial act was not founded on a finding of the facts necessary to support it. It seems hardly necessary to cite authorities in support of this view; but the cases of Grignon v. Astor, 3 How. [44 U. S.] 339, Philadelphia & T. R. Co. v. Stimpson, 12 Pet. [37 U. S.] 458, and the cases there referred to, are directly in point to show that, where a judicial act is to be done upon proofs laid before the tribunal, and the act is done, it is to be presumed that the necessary facts were proved, and no other tribunal is at liberty to re-examine the question. And, in the case of U. S. v. Haskell [Case No. 15,321], a prisoner being put on trial for piracy, pleaded a special plea, in which he set forth that he had been once put on trial, and the jury were discharged merely because they declared they could not agree, but did not state the true reason which induced the court to discharge them; and the district attorney having demurred to the plea, Judge Washington held that the only course was to demur; that a traverse carrying the issue to a jury, to try whether the discretion of the court had been exercised upon facts affording a proper basis for that discretion, ought not to be taken; that all facts necessary to support the act of the court must be presumed, and that the discharge of a jury, being an act of judicial discretion, could not form the subject of a plea in bar.

It was ingeniously argued, that the averment in this plea is, that the jury were discharged without necessity; that there was one proposition of fact,—not first admitting the fact of the discharge, and then averring it to be without necessity, but characterizing the act itself as an unnecessary discharge, and that so there was no estoppel. As has been already stated, my opinion does not rest on the ground of estoppel, even chiefly. But I think this argument is not sound. It cannot be contended that the meaning of this plea is, that the record of the discharge on its face purports that there was no necessity, and sets that out as the basis of judicial action; and if not, then the substance of this averment is, that the judicial act which the record will show, was done although there was no necessity; that is, the court, in the exercise of its discretion, discharged the jury, and the defendant says it was without necessity. This he is clearly estopped from averring.

It remains only to notice two other objections taken by defendant's counsel,—that evidence was admitted after the juror had been examined on the voir dire, and that a juror cannot be challenged twice for the same cause. What has been already stated, as to the power of the court to interpose, and the distinction between an exercise of this power and the right of a party to challenge, is sufficient answer to this objection. But it may be added, that it is competent for a party to introduce evidence after examining a juror, if the evidence relates to a matter which was unknown to the juror when examined. And it does not appear, from this plea, that the

evidence did not relate exclusively to a state of mind of the juror formed after he was sworn, or that the cause of challenge, if it were to be treated as a challenge, did in fact exist. when the juror was sworn.

I have purposely avoided placing this opinion upon the statute law of Massachusetts, because, although the qualifications of jurors, and consequently the causes of challenge, are governed by the law of the state, it does not necessarily follow that the modes and times of making challenges are governed by the same law. I wish to be understood as not giving any opinion on this question, which is an important one, and not necessary to be decided under this plea. But it is so clearly the general policy of the laws of the United States to assimilate the modes of proceeding in the courts of the United States to those prescribed by laws of the states where the courts are held, that it is satisfactory to find that the state has, by express enactment (Rev. St. c. 95, § 29), conferred on parties a right of challenge, after a juror is sworn, for a cause then existing, and even known to him, if the court think it proper to grant leave to make the challenge; and, as a guide for the exercise of the discretion of the district court in Massachusetts, there can be no doubt of its eminent fitness. My opinion is, that the demurrer must be sustained, and the plea adjudged bad.

The district attorney called, as a witness, John Debree, who testified that he resided at Norfolk, Virginia, and Shadrach was his slave; that he purchased him in November, 1849, of John A. Higgins, and he remained in the service of the witness until May, 1850, when he left secretly, and without his consent; that he held him as a slave for life, and had not manumitted him. The district attorney also called, as a witness, John Caphart, who testified that he was a resident of Norfolk, and had known Shadrach about sixteen years. When he first knew him he belonged to the Glen estate, and lived in Norfolk; he knew the persons who were called his mother and father, some ten or twelve years; his mother and father were said to belong to the same Glen estate. He had often heard Shadrach call them mother and father. He afterwards knew Shadrach as the property of Mrs. Hutchins, and he was sold by the sheriff at public vendue, at the door of the court-house, and bought by John A. Higgins. That the witness, as a police officer, had arrested Shadrach for Higgins, and put him in jail; that Higgins employed him in working on the stand as a licensed porter; that he did not· know of his doing any act of service for the Glens, but only heard the young Glens speak of him as their slave. Each of these witnesses described Shadrach as being between black and mulatto. This testimony was objected to by the defendant's counsel, as not competent evidence in support of the allegation, in some of the counts, that Shadrach was

a person held to service and labor by John Debree, under the laws of Virginia. It was contended that, by the law of Virginia, no person is a slave except persons who were so in 1785, and the descendants of the females of them, and persons who, being slaves in other states, were introduced into Virginia, under certain regulations contained in the statute law of that state, and the descendants of the females of them; that although there is a presumption there that negroes are held to service as slaves, that presumption did not obtain in reference to persons who had some white blood, as Shadrach is testified to have had, and that, consequently, the only mode of proving that Shadrach was held to service under the laws of Virginia, is to trace back his descent, through the maternal line, to some maternal ancestor who was a slave in 1785, or to some slave introduced into Virginia from· another state; that this alone would, in Virginia, show that he was held to service under the laws of that state, and that this alone would be admissible evidence of his status on this trial.

CURTIS, Circuit Justice. The first four counts in this indictment contain the allegation that Shadrach was held to service and labor by John Debree, under the laws of the state of Virginia. To maintain these counts it is necessary to prove this allegation; but unless some substantial distinction between this allegation and other similar allegations in indictments can be shown, it is to be proved by such evidence, and upon such principles, as would be applicable in other criminal cases. The principal distinction relied on is, that the allegation concerns the freedom of Shadrach; and it is urged that, in Virginia, such evidence would not be admissible. Conceding this, I am not able to perceive that it decides this question; because this is not a suit for freedom, nor can a judgment either way have any effect upon the right of either the alleged master or slave. It is said, however, that the cases cited show that, in Virginia, such evidence would not, in any case, be competent to prove that one man, not a pure negro, was the slave of another. I have examined these decisions with care, because, if I had found such to be the law of Virginia, I should certainly have hesitated to decide that a different rule should be held here; though I am not prepared to admit that, on the trial of an indictment in this court, the rules of evidence are the same as in Virginia, even where the fact to be proved is the status of a person in Virginia. The general principle is certainly otherwise, rules of evidence being part of the law of the forum. Still, inasmuch as, in Virginia, common-law rules form the basis of their law of evidence, an application of those rules to a peculiar class of cases, of frequent occurrence there, and depending, here as well as there, so far as touches the right, upon their local law, would have great weight in my mind. And therefore, as I have said, I

have looked carefully into all the cases cited by the defendant's counsel, and do not find they support the position assumed. They show satisfactorily that, in suits which directly involve the freedom of one of the parties, length of possession is not a bar to the claim for freedom; and that in some states, in such a suit, possession affords very feeble evidence of a legal state of slavery. But they go no further. They are all cases which directly involved the freedom of one of the parties.

The case in 1 Hen. & M. 133, was a suit for freedom, and a decree for the freedom of the complainants was made by the chancellor, and confirmed by the court of appeals. The other case, in 1 Tayl. (N. C.) 165, put in issue, on the record, the freedom of the plaintiff, the defendant claiming him as her slave, and I cannot doubt that both parties were bound by the verdict on this issue. The case itself settles only that there is no presumption of slavery from color alone, in Virginia, unless the party is a negro. 8 B. Mon. 621, which is a very strong case, was a suit for the freedom of the complainant, as was that in 1 Mart. (La.) 184, which affirms the doctrine in 1 Tayl. (N. C.) 165. The courts, not only of Virginia, but of other slave states, seem to have treated suits for freedom as a distinct class of cases, not controlled by some of the rules which are ordinarily administered, but entitled to a kind of favor, not extended to any other legal proceeding. Vaughan v. Phebe, Mart. & Y. 5; 1 Hen. & M. 134.

But I have looked in vain for cases tending to show that whenever the fact of slavery, under the law, is put in issue, in a proceeding other than a suit involving freedom, any rules of evidence are administered anywhere, except such as are applicable to similar facts in cases at the common law. The absence of any such evidence affords, in my judgment, very strong reasons for the belief that no such distinction between evidence to prove legal slavery, and evidence to prove any similar fact, exists in Virginia; and this for two reasons. There is a very considerable number of penal laws in that, as well as other states, which would require indictments and actions framed upon them to allege the fact that one person was the slave of another; of course this allegation must be proved. Many cases are reported in which questions have grown out of this allegation. Now, if it were necessary, in support of such allegation, in every case where the alleged slave was not a negro, to trace back his pedigree to 1785, it is hardly possible that numerous questions of law should not have grown out of so peculiar a state of things, and found their way into the books. In the next place, the enormous inconvenience of this rule, viewed practically, is a reason for not expecting to find it. One is indicted for selling intoxicating liquor to a slave, or trading with a slave, without license from his master, or for a great variety of other offences created by statute in the slave states, as matters of local police. The fact of slavery under the law must be proved. Is it conceivable that it should be required in such cases to trace a pedigree for upwards of sixty years, or would it be enough for the master to testify that the person mentioned in the indictment was his slave? On the other hand, it is settled, by the supreme court of the United States, that, even in a suit for freedom, the same rules of evidence are administered as in other cases, and there is highly respectable authority, that where the fact of slavery is to be proved, under an indictment, penal action, or other proceeding, the same presumptions are allowed as the law deems applicable to other similar facts.

The case of Mima v. Hepburn, 7 Cranch [11 U. S.] 295, was a suit for freedom. Chief Justice Marshall, in delivering the opinion of the court, says: "However the feelings of the individual may be interested on the part of a person claiming freedom, the court cannot perceive any legal distinction between the assertion of this and of any other right, which will justify the application of a rule of evidence to cases of this description, which would be inapplicable to general cases in which a right to property may be asserted. The rule, then, which this court shall establish in this cause will not, in its application, be confined to cases of this particular description, but will be extended to others, where rights may depend on facts which happened many years past." Johnson v. Tompkins [Case No. 7,416], was a penal action for a rescue. Mr. Justice Baldwin says: "On a question of slavery or freedom, the right is to be established by the same rules of evidence as in other contests about the right to property [Mima v. Hepburn] 7 Cranch [11 U. S.] 295; quiet and undisturbed possession is evidence of ownership, and cannot be disturbed by any one who has not the right of property, and the burden of proof rests on the one who is not in possession." In Township of Chatham v. Canfield's Ex'rs, 3 Hals. [8 N. J. Law] 52, the question was, whether the executors were bound to support a pauper, as the slave of the testator, and it is treated as a question of circumstantial evidence. In Miller v. Denman, 8 Yerg. 233, where the precise point was, what would be prima facie evidence of slavery, in a penal action for enticing away the plaintiff's slave, it is held, that the mere fact of possession and claim of ownership is not sufficient to encounter the presumption arising from the usual marks of European descent; but that dark complexion, woolly head, and flat nose, with possession and claim of ownership, do afford prima facie evidence of the slavery and ownership charged.

These authorities compel me to come to the conclusion that, though the fact of slavery, under the law of Virginia, is to be proved, it may, in this case, be proved by such

evidence as, upon the principles of the common law, is competent and sufficient. Upon the principles of the common law, I think this evidence is competent, and, if not controlled, sufficient to establish the fact, that Shadrach was held to service by Mr. Debree under the laws of Virginia. This is a question of status, of his relation to another person. How is such a matter ordinarily proved? Very commonly by showing that the person was treated as standing in that relation. The question arises, whether A is the heir of B. This is a complex question, embracing both law and fact. There must have been a lawful marriage and cohabitation, and B the issue of that marriage. Yet it is competent and sufficient evidence, that B treated A as his son. Berkeley Peerage Case, 4 Camp. 416. This is also a question of property under the law of Virginia; and, by the common law, possession is evidence of property, unless the circumstances accompanying the possession rebut the inference of property.

It is argued, however, that the law requires the best evidence. To appreciate this argument, it is necessary to look a little further, and see what the defendant's counsel consider is the best evidence. Suppose the government were to attempt to trace the pedigree of this man back to 1785. The first step would be to show, by persons who knew them, that some person spoke of and treated him as her son, and that he spoke of and treated her as his mother, or that he was reputed among those nearly connected to be her son, and thus go back to some maternal ancestor in 1785; and, having arrived at that point, the next step would be to prove that that ancestor was a slave; and I suppose it would hardly be doubted that this last could be proved, by showing that she had marks of African descent, and was bought and sold as a slave, and held as such all her lifetime. But, in that case, we should not have evidence of any different nature, or any which the law considers better. Indeed, if a pedigree were to be proved, even hearsay evidence would be admissible; so that we should thus have evidence of the lowest kind, which ordinarily is not competent.

The case of master and apprentice was mentioned; but here a deed is necessary to constitute this relation; and the deed is a higher kind of evidence, and must be produced, or its loss shown and its contents proved. As to the case of a public officer, which has been alluded to as illustrating the argument, it is well settled, that it is not necessary to produce his commission. It is enough, prima facie, that he acted as an officer. 1 Greenl. Ev. §§ 83, 92. The rule which requires the best evidence to be produced, does not seem to me to have any application to this case. The real point of the objection is, not that there is better evidence, but that the government offer evidence that this person was bought and sold and treated as a slave, instead of tracing back his pedigree to some one in 1785, and then offering evidence that that person was bought and sold and treated as a slave. But if the evidence would be competent, in the last case, to prove, prima facie, a state of slavery of the ancestor in 1785, why is it not also competent, in the first case, to prove a state of slavery of Shadrach in 1849? The ancestor in 1785 must be shown to be legally a slave; and if such evidence would be admissible to prove that, I am wholly at a loss to perceive why it is not equally admissible in this case. Upon the authority of the cases cited from 7 Cranch [11 U. S.] reviewed and confirmed in Davis v. Wood, 1 Wheat. [14 U. S.] 6, and upon the decision of Mr. Justice Baldwin, before referred to, and the principles of the common law of evidence, I think this evidence is admissible, and, if not controlled, sufficient to establish that Shadrach was held to service under the laws of Virginia when he escaped from that state. Certainly, it is merely prima facie, and liable to be controlled by other evidence, tending to show that he was not a slave.

While one of the counsel for the defendant was addressing the jury, he stated the proposition that, this being a criminal case, the jury were rightfully the judges of the law, as well as the fact; and if any of them conscientiously believed the act of 1850 [9 Stat. 462], commonly called the "Fugitive Slave Act," to be unconstitutional, they were bound by their oaths to disregard any direction to the contrary which the court might give them; and he was about to address the jury in support of this assertion, when he was stopped by the court, and informed that he could not be permitted to argue this proposition to the jury; that the court would hear him, and if they should be of the opinion that the proposition was true, the jury would be so informed by the court; and the counsel then addressed the court in support of the position. The opinion of the court thereon was delivered by

CURTIS, Circuit Justice. The constitution of the United States, art. 3, § 2, provides, that "the trial of all crimes, except in cases of impeachment, shall be by jury." The counsel for the defendant maintains that, in every such trial of a crime, the jury are the judges of the law, as well as of the fact; that they have not only the power, but the right, to decide the law; that, though the court may give its opinion to the jury respecting any matter of law involved in the issue, yet the jury may and should allow to that opinion only just such weight as they may think it deserves; that, if it does not agree with their own convictions, they are bound to disregard it, the responsibility of deciding rightly all questions, both of law

and fact, involved in the general issue, resting upon them, under the sanction of their oaths. This is an important question, and it has been pressed upon the attention of the court, with great earnestness and much power of language, by one of the defendant's counsel. I have no right to avoid a decision of it. I certainly should have preferred to have a question of so much importance,—respecting which so deep an interest is felt, such strong convictions entertained, and, I may add, respecting which there has not been an entire uniformity of opinion,—go to the highest tribunal for a decision; but it is not practicable in this case. I proceed, therefore, to state the opinion which I hold concerning it. The true question is, what is meant by that clause of the constitution, "the trial of crimes shall be by jury."

Assuming, what no one will controvert, that the tribunals for the trial of crimes were intended to be constituted, as all common-law tribunals in which trial by jury was practised were constituted, having one or more judges, who were to preside at the trials, and form one part of the tribunal, and a jury of twelve men, who were to form the other part, and that one or the other must authoritatively and finally determine the law, was it the meaning of the constitution that to the jury, and not to the judges, this power should be intrusted? There is no sounder rule of interpretation than that which requires us to look at the whole of an instrument, before we determine a question of construction of any particular part; and this rule is of the utmost importance, when applied to an instrument, the object of which was to create a government for a great country, working harmoniously and efficiently through its several executive, legislative, and judicial departments. It is needful, therefore, before determining this question upon a critical examination of the particular phrase in question, to examine some other provisions of the constitution, which are parts of the same great whole to which the clause in question belongs. We find, in article 6: "This constitution, and the laws of the United States which shall be made in pursuance thereof and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land." Nothing can be clearer than the intention to have the constitution, laws, and treaties of the United States in equal force throughout every part of the territory of the United States, alike in all places, at all times. To secure this necessary end, a judicial department was created, whose officers were to be appointed by the president, paid from the national treasury, responsible, through the house of representatives, to the senate of the United States, and so organized, by means of the supreme court, established by the constitution, and such inferior courts as congress might establish, as to secure a uniform and consistent inter-

pretation of the laws, and an unvarying enforcement of them, according to their just meaning and effect. That whatever was done by the government of the United States should be by standing laws, operating equally in all parts of the country, binding on all citizens alike, and binding to the same extent, and with precisely the same effect, on all, was undoubtedly intended by the constitution; and any construction of a particular clause of the constitution, which would tend to defeat this essential end, is, to say the least, open to very serious objection.

It seems to me, that what is contended for by the defendant's counsel would have something more than a mere tendency of this kind. The Federalist, in discussing the judicial power, remarks: "Thirteen independent courts of final jurisdiction over the same causes, arising upon the same laws, is a hydra in government, from which nothing but contradiction and confusion can proceed." Federalist, No. 80. But what is here insisted on is, that every jury, impannelled in every court of the United States, is the rightful and final judge of the existence, construction, and effect of every law which may be material in the trial of any criminal case; and not only this, but that every such jury may, and, if it does its duty, must, decide finally, and without any possibility of a revision, upon the constitutional power of congress to enact every statute of the United States which on such a trial may be brought in question. So that we should have, not thirteen, but a vast number of courts, having final jurisdiction over the same causes, arising under the same laws; and these courts chosen by lot among us, and selected by the marshal elsewhere, out of the body of the people, with no reference to their qualifications to decide questions of law; not allowed to give any reasons for their decisions, as will be presently shown, not sworn to decide the law, nor even to support the constitution of the United States; and yet possessing complete authority to determine that an act passed by the legislative department, with all the forms of legislation, is inoperative and invalid. The practical consequences of such a state of things are too serious to be lightly encountered; and, in my opinion, the constitution did not design to create or recognize any such power by the clause in question. Some light, as to its meaning, may be derived from other provisions in the same instrument. The sixth article, after declaring that the constitution, laws, and treaties of the United States shall be the supreme law of the land, proceeds, "and the judges, in every state, shall be bound thereby." But was it not intended. that the constitution, laws, and treaties of the United States should be the supreme law in criminal as well as in civil cases? If a state law should make it penal for an officer of the United States to do what an act of congress commands him to

do, was not the latter to be supreme over the former? And if so, and in such cases, juries finally and rightfully determine the law, and the constitution so means when it speaks of a trial by jury, why was this command laid on the judges alone, who are thus mere advisers of the jury, and may be bound to give sound advice, but have no real power in the matter? It was evidently the intention of the constitution, that all persons engaged in making, expounding, and executing the laws, not only under the authority of the United States, but of the several states, should be bound by oath or affirmation to support the constitution of the United States. But no such oath or affirmation is required of jurors, to whom it is alleged the constitution confides the power of expounding that instrument; and not only construing, but holding invalid, any law which may come in question on a criminal trial. This may all be true; but strong reasons should be shown before it can be admitted.

I have considered with much care the reasons assigned and the authorities cited by the defendant's counsel, and have examined others which he did not cite; and the result is, that his position, both upon authority and reason, is not tenable. I will first state what is my own view of the rightful powers and duties of the jury and the court in criminal cases, and then see how far they are in conformity with the authorities, and consistent with what is admitted by all to be settled law. In my opinion, then, it is the duty of the court to decide every question of law which arises in a criminal trial; if the question touches any matter affecting the course of the trial, such as the competency of a witness, the admissibility of evidence, and the like, the jury receive no direction concerning it; it affects the materials out of which they are to form their verdict, but they have no more concern with it than they would have had if the question had arisen in some other trial. If the question of law enters into the issue, and forms part of it, the jury are to be told what the law is, and they are bound to consider that they are told truly; that law they are to apply to the facts, as they find them, and thus, passing both on the law and the fact, they, from both, frame their general verdict of guilty or not guilty. Such is my view of the respective duties of the different parts of this tribunal in the trial of criminal cases, and I have not found a single decision of any court in England, prior to the formation of the constitution, which conflicts with it. It was suggested at the bar, that Chief Justice Vaughan's opinion, in Bushnell's Case, 5 State Tr. 99, was in support of the right of juries to determine the law in a criminal case; but it will be found that he confines himself to a narrow though, for the case, a conclusive line of argument, that the general issue embracing fact as well as law, it can never be proved that the jury believed the testimony on which the fact depended, and in

reference to which the direction was given, and so they cannot be shown to be guilty of any legal misdemeanor in returning a verdict, though apparently against the direction of the court in matter of law.

Considering the intense interest excited, the talent and learning employed, and consequently the careful researches made, in England, near the close of the last century, when the law of libel was under discussion in the courts and in parliament, it cannot be doubted that, if any decision, having the least weight, could have been produced in support of the general proposition, that juries are judges of the law in criminal cases, it would then have been brought forward. I am not aware that any such was produced. And the decision of the king's bench, in Rex v. Dean of St. Asaph, 3 Term R. 428, note, and the answers of the twelve judges to the questions propounded by the house of lords, assume, as a necessary postulate, what Lord Mansfield so clearly declares in terms, that, by the law of England, juries cannot rightfully decide a question of law. Passing over what was asserted by ardent partisans and eloquent counsel, it will be found that the great contest concerning what is known in history as "Mr. Fox's Libel Bill," was carried on upon quite a different ground by its leading friends; a ground which, while it admits that the jury are not to decide the law, denies that the libellous intent is matter of law; and asserts that it is so mixed with the fact that, under the general issue, it is for the jury to find it as a fact.[2] Such I understand to be the effect of that famous declaratory law. St. 32 Geo. III. c. 60. The defendant's counsel argued that this law had declared that, on trials for libel, the jury should be allowed to pass on law and fact, as in other criminal cases. But this is erroneous. Language somewhat like this occurs in the statute, but in quite a different connection, and, as I think, with just the opposite meaning. "The court or judge, before whom such indictment or information shall be tried, shall, according to their or his discretion, give their or his opinion and directions to the jury, on the matter in issue between the king and the defendant, in like manner as in other criminal cases." This seems to me to carry the clearest implication that, in this and all other criminal cases, the jury may be directed by the judge; and that, while the object of the statute was to declare that there was other matter of fact besides publication and the innuendoes to be decided by the jury, it was not intended to interfere with the proper province of the judge, to decide all matters of law. That this is the received opinion in England, and that the general rule, declared in Rex v. Dean of St. Asaph, that juries cannot rightfully decide the law in criminal cases, is still the law in England, may be seen by

---

[2] 34 Ann. Reg. p. 170. 29 Par. His. Debates in the Lords, and particularly Lord Camden's speeches.

reference to the opinions of Parke, B., in Par-miter v. Coupland, 6 Mees. & W. 105; and of Best, C. J., in Levi v. Milne, 4 Bing. 195. I conclude, then, that when the constitution of the United States was founded, it was a settled rule of the common law that, in criminal as well as civil cases, the court decided the law, and the jury the facts; and it cannot be doubted that this must have an important effect in determining what is meant by the constitution when it adopts a trial by jury.

It is argued, however, that, in passing the sedition law (St. 1798, c. 74, § 3 [1 Stat. 597]) congress expressly provided, that the jury should have the right to determine the law and the fact, under the direction of the court, as in other cases, and that this shows that in other cases juries may decide the law, contrary to the direction of the court. I draw from this the opposite inference; for where was the necessity of this provision if, by force of the constitution, juries, as such, have both the power and the right to determine all questions in criminal cases; and why are they to be directed by the court? In Montgomery v. State, 11 Ohio, 427, the supreme court of Ohio, in discussing the question, whether juries are judges of the law, refer to an article in the bill of rights of that state, which is in the same words as this section of the sedition act, and the opinion of the court then proceeds: "It would seem from this that the framers of our bill of rights did not imagine that juries were rightfully judges of law and fact in criminal cases, independently of the direction of courts. Their right to judge of the law is a right to be exercised only under the direction of the court; and if they go aside from that direction, and determine the law incorrectly, they depart from their duty and commit a public wrong; and this in criminal as well as civil cases." There is, however, another act of congress which bears directly on this question. The act of the 29th of April, 1802 [2 Stat. 156], in section 6, after enacting that, in case of a division of opinion between the judges of the circuit court, on any question, such question may be certified to the supreme court, proceeds: "And shall by the said court be finally decided. And the decision of the supreme court, and their order in the premises, shall be remitted to the circuit court, and be there entered of record, and have effect according to the nature of such judgment and order." The residue of this section proves that criminal as well as civil cases are embraced in it; and under it, many questions arising in criminal cases have been certified to and decided by the supreme court, and persons have been executed by reason of such decisions. Now, can it be that, after a question arising in a criminal trial has been certified to the supreme court, and there, in the language of this act, finally decided, and their order remitted here and entered of record, that when the trial comes on, the jury may rightfully

revise and reverse this final decision? Suppose, in the course of this trial, the judges had divided in opinion upon the question of the constitutionality of the act of 1850, and that, after a final decision thereon by the supreme court and the receipt of its mandate here, the trial should come on before a jury, does the constitution of the United States, which established that supreme court, intend that a jury may, as matter of right, revise and reverse that decision? And, if not, what becomes of this supposed right? Are the decisions of the supreme court binding on juries, and not the decisions of inferior courts? This will hardly be pretended; and if it were, how is it to be determined whether the supreme court has or has not, in some former case, in effect, settled a particular question of law? In my judgment, this act of congress is in accordance with the constitution, and designed to effect one of its important and even necessary objects—a uniform exposition and interpretation of the law of the United States—by providing means for a final decision of any question of law; final as respects every tribunal, and every part of any tribunal in the country; and if so, it is not only wholly inconsistent with the alleged power of juries, to the extent of all questions so decided, but it tends strongly to prove, that no such right as is claimed does or can exist.

An examination of the judicial decisions of courts of the United States since the organization of the government will show, as I think, that the weight of authority is against the position taken by the defendant's counsel. The earliest case is [Georgia v. Brailsford] 3 Dall. [3 U. S.] 4. Chief Justice Jay is there reported to have said to a jury, that on questions of fact it is the province of the jury, on questions of law it is the province of the court to decide. And, in the very next sentence, he informs them, they have the right to take upon themselves to determine the law as well as the fact. And he concludes with the statement, that both law and fact are lawfully within their power of decision. I cannot help feeling much doubt respecting the accuracy of this report; not only because the different parts of the charge are in conflict with each other, but because I can scarcely believe that the chief justice held the opinion that, in civil cases, and this was a civil case, the jury had the right to decide the law. Indeed the whole case is an anomaly. It purports to be a trial by jury, in the supreme court of the United States, of certain issues out of chancery. And the chief justice begins by telling the jury that the facts are all agreed, and the only question is a matter of law, and upon that the whole court were agreed. If it be correctly reported, I can only say, it is not in accordance with the views of any other court, so far as I know, in this country or in England, and is certainly not in accordance with the course of the supreme court for many years.

In U. S. v. Wilson [Case No. 16,730], which

was an indictment for robbing the mail, the court instructed the jury explicitly, that they had a right to judge of the law, and decide contrary to the opinion of the court; but in U. S. v. Shive [Id. 16,278], which was an indictment for passing a counterfeit note of the bank of the United States, the defendant's counsel, having insisted to the jury that the bank was unconstitutional, the court, with equal explicitness, told the jury they had no right to judge of the constitutionality of an act of congress, and, in the strongest terms, declared, that the exercise of such a power would leave us without a constitution or laws. With great respect for the very able and learned judge, I cannot but think that the criticism of Judge Conkling (Conkl. Prac. 426) is just, when he confesses his inability to discover any difference in principle between these two cases, with respect to the rights of juries to decide the law in criminal cases; and if so, the later opinion of that court was entirely adverse to the right claimed.

It has been suggested, that the articles of impeachment of Judge Chase, and the line of defence adopted by his counsel, have a tendency to support the views of the defendant's counsel. The first article of impeachment does speak of the undoubted right of juries to judge of the law in criminal cases; but I can allow no other force to this, than that it proves that a majority of the then house of representatives thought it fit to make that allegation in that proceeding. And, although the counsel for the accused rested the defence of their client against this charge mainly on a denial of the facts, yet, in the arguments of Mr. Martin and Mr. Harper, will be found a statement of their opinions on this question, marked with that ability for which both were so highly distinguished, and leaving no ground for the assertion, that the right in question was conceded by them. Chase's Trial, p. 182. In United States v. Battiste [Case No. 14,545], Mr. Justice Story pronounced an opinion on this question, during the trial of a capital indictment. He denied that this right existed, and gave reasons for the denial of exceeding weight and force. If we look to the decisions of the courts of the states, I think we shall find their weight in the same scale. The earliest case is People v. Croswell, 3 Johns. Cas. 337. The question was, as to the right of the jury to pass on and decide the intent, under an indictment for a libel. The court were equally divided. As has already been suggested, this is by no means the question raised here; and that by the law of the state of New York, at this day, the jury are not judges of the law, in the sense now contended for, I infer, from the opinion of Judge Barculo, in People v. Pine, 2 Barb. 566; for, in the trial of an indictment for murder, he told the jury that it was their duty to receive the law from the court, and conform their decision to its in-

structions; and under this ruling the prisoner was convicted and executed.

This question has been very carefully considered, and elaborate and extremely able opinions upon it delivered by the highest courts in Indiana, New Hampshire, and Massachusetts. Townsend v. State, 2 Blackf. 152; Pierce v. State, 13 N. H. 536; Com. v. Porter, 10 Metc. (Mass.) 263. The reasoning of these opinions, so far as it is applicable to the question before me, has my entire assent. The question is not necessarily the same in the courts of the several states, and of the United States, though many of the elements which enter into it are alike in all courts of common law, not bound by some statute or constitutional provision.

It remains for me to notice briefly some of the arguments which are relied on by the defendant's counsel, in support of his position. It is said that, in rendering a general verdict of guilty, or not guilty, the jury have the power to pass, and do in fact pass, on everything which enters into the crime. This is true. But it is just as true of a general verdict in trover or trespass; and yet I suppose the right of the jury to decide the law in those cases, is not claimed. The jury have the power to go contrary to the law as decided by the court; but that the power is not the right, is plain, when we consider that they have also the like power to go contrary to the evidence, which they are sworn not to do.

It is supposed that the old common-law form of the oath of jurors, in criminal cases, indicates that they are not bound to take the law from the court. It does not so strike my mind. They are sworn to decide according to the evidence. This must mean that they are to decide the facts according to the evidence. But if they may also decide the law, they are wholly unsworn as to that, and act under no obligation of an oath at all in making such decision. A passage in Littleton's Tenures (lib. 3, § 368), and the statute of Westminster II. c. 30 (13 Edw. I.), and the commentary of Coke thereon, relating to an assize (2 Inst. 425), have been referred to, as throwing light on this inquiry; but it seems to me enough to say, that the assize was not a jury; that an assize was not a criminal case, but an action between party and party, and that if the statute intended to confer on the assize the right as well as the power to decide the law, it was a strange provision which subjected them to punishment if they decided the law wrong; for it would seem that what was right or what was wrong must be determined by the tribunal having the rightful power to determine it, which is supposed to be the assize itself.[3] That it has been a familiar saying among the profession in this country, and an opinion entertained by highly respect-

---

[3] For some able criticism on this statute, see the opinion of Gilchrist, J., in 13 N. H. 542; Worth. Jur. 72–94.

able judges, that the jury are judges of the law as well as of the facts, I have no doubt. In some sense I believe it to be true, for they are the sole judges of the application of the law to the particular case. In this sense, theirs is the duty to pass on the law—a most important, and often difficult duty, which, when discharged, makes the difference between a general and a special verdict, which, although they may return, they are not bound to return. They are a coördinate branch of the tribunal, having their appropriate powers and rights and duties, with the proper discharge and exercise of which no court can, without usurpation, interfere; but it is not their province to decide any question of law in criminal, any more than civil cases; and if they should intentionally fail to apply to the case the law given to them by the court, it would be, in my opinion, as much a violation of duty as if they were knowingly to return a verdict contrary to the evidence.

A strong appeal has been made to the court, by one of the defendant's counsel, upon the ground that the exercise of this power by juries is important to the preservation of the rights and liberties of the citizen. If I thought so, I should pause long before I denied its existence. But a good deal of reflection has convinced me that the argument drawn from this quarter is really the other way. As long as the judges of the United States are obliged to express their opinions publicly, to give their reasons for them when called upon in the usual mode, and to stand responsible for them, not only to public opinion, but to a court of impeachment, I can apprehend very little danger of the laws being wrested to purposes of injustice. But on the other hand, I do consider that this power and corresponding duty of the court, authoritatively to declare the law, is one of the highest safeguards of the citizen. The sole end of courts of justice is to enforce the laws uniformly and impartially, without respect of persons or times, or the opinions of men. To enforce popular laws is easy. But when an unpopular cause is a just cause, when a law, unpopular in some locality, is to be enforced there, then comes the strain upon the administration of justice; and few unprejudiced men would hesitate as to where that strain would be most firmly borne.

I have entered thus at large into this important question, in the course of a jury trial, with unaffected reluctance. Having been directly and strongly appealed to, and finding that no judge of any court of the United States had, in any published opinion, examined it upon such grounds, that I could feel I had a right to repose on his decision without more, I knew not how to avoid the duty which was thus thrown upon me. My firm conviction is, that under the constitution of the United States, juries, in criminal trials, have not the right to decide any question of law; and that if they render a general verdict,

their duty and their oath require them to apply to the facts, as they may find them, the law given to them by the court.