# STATE v. McNAUGHTAN.

No. 5582. Decided May 29, 1936. (58 P. [2d] 5.)

FOR OPINION ON REHEARING, see 92 Utah 114, 66 P. (2d) 137.

*B. W. Dalton,* of Price, and *Chris Mathison, Karl V. King,* and *Thomas W. Mackay,* all of Salt Lake City, for appellant.

*Joseph Chez,* Atty. Gen., and *Zelph S. Calder,* Deputy Atty. Gen., for the State.

ELIAS HANSEN, Chief Justice.

Defendant was charged with and convicted of the crime of altering marks and brands on six sheep with the intent of stealing the same. It is charged in the information that four of the sheep so marked and branded were the property of John L. Siddoway, one the property of Raymond Siddoway, and one the property of Wm. H. Siddoway. The character of the changes made in the earmarks of the various sheep is alleged in the information. It is also alleged that all of the sheep in question were branded with red paint, five with a circle-bar, and one with a daub. The offense is alleged to have been committed "in Uintah County, State of Utah, near the boundary line of Uintah and Daggett Counties, State of Utah." A trial resulted in a verdict of guilty as charged. Defendant was sentenced to serve an indeterminate term in the state prison. He appeals. Not all of the errors assigned are argued. We shall consider only the assignments argued, as the others are deemed waived. After the court below had examined the jurors touching their qualifications, leave was granted counsel to examine them. Counsel for defendant asked one of the jurors as to whether or not he was indebted to the Uintah State Bank. Objection was made to the question and the objection sustained. Error is assigned because of that ruling. Later in the trial it was made to appear that Wm. H. Siddoway, the alleged owner of one of the sheep in controversy, was the president of the Uintah State Bank. So far as appears, however, there is nothing in the record which showed, or tended to show, that Mr. Siddoway was connected with that bank at the time the jurors were being examined. Appellant calls our attention to the doctrine that the object of examining jurors on voir dire is not only to ascertain whether or not any statutory grounds for challenge exist, but also to enable a party to the proceeding

to exercise an intelligent peremptory challenge. The extent to which jurors may be examined is largely a matter within the discretion of the trial court. We are not prepared to say that the court below abused its discretion in sustaining the objection to the question of whether or not the juror was indebted to the Uintah State Bank, especially so in light of the fact that at the time the question was asked it did not appear that Mr. Siddoway was connected with that bank.

Complaint is also made because Wm. H. Siddoway shook hands with two of the jurors after they had been accepted to try the cause. The incident occurred in the courtroom as the jurors passed Mr. Siddoway on their way out of the courtroom. After the incident occurred, a motion for a mistrial on the ground of claimed misconduct of Mr. Siddoway was made and denied. Error is assigned because of that ruling. While courts should always do their utmost to prevent all improper influencing of jurors, yet the mere fact that a complaining witness shakes hands with some of the jurors is not a sufficient ground to declare a mistrial. Some time after the trial commenced, an anonymous letter was received by one of counsel for defendant informing him that one of the jurors was indebted to Wm. H. Siddoway. The matter was immediately called to the attention of the trial court and an investigation made to ascertain the fact in such respect. Investigation disclosed that one of the jurors was indebted to Mr. Siddoway in a substantial amount and that such fact was known to the district attorney before the jury was sworn to try the cause. Thereupon counsel for defendant moved the court to declare a mistrial. The motion was denied. Error is assigned because of that ruling. It appears from the record before us that a number of prospective jurors were examined as to whether or not they were indebted to Mr. Siddoway. The juror who was in fact indebted to him was not examined as to that subject-matter. It is appellant's position that the juror being indebted to Mr. Siddoway was subject to challenge for implied bias under R. S. Utah 1933, 105-31-19,

and that it was the duty of such juror to make known such indebtedness, especially in light of the fact that the other jurors were examined in her presence touching that matter. The cases of *Montgomery* v. *Morton*, 143 Ky. 793, 137 S. W. 540, 542, and *Block* v. *State*, 100 Ind. 357, are cited and relied upon in support of that contention. In the Kentucky case one of the jurors was indebted to one of appellants' counsel. The court said:

"This did not disqualify him, but appellants' counsel had a right to know it so that they could, if they desired, excuse him as one of their three peremptory challenges, and the juror should have made the fact of his indebtedness to one of the counsel known when he was examined as to his qualifications. His failure to do so, however, did not render him incompetent."

It was held in that case that the failure of the juror to make known his indebtedness to one of appellants' counsel did not justify the granting of a new trial. It will be observed that the Kentucky case makes against, rather than in favor of, appellants' contention. In the Indiana case it was held that:

"A deputy of the prosecuting attorney, though not a lawyer, is not a competent juror in a criminal cause, and may be challenged; and if the fact be not discovered until after verdict, a new trial should be granted, though he make oath that he was not influenced thereby."

The quotation is from the syllabus of that case and reflects the opinion of the court. While the Indiana case lends some support to appellant's position, the cases from this jurisdiction are against his contention. In the case of *People* v. *Lewis*, 4 Utah 42, 5 P. 543, it was held that:

"The fact that one of the jury who tried defendant was one of the grand jury that found the indictment against him, where no question was asked of such juror touching the point, and no challenge for cause made, is not ground for granting a new trial."

The quotation is from the syllabus. It reflects the opinion of the court in that case. In the case of *State* v. *Lanos*, 63 Utah 151, 223 P. 1065, 1066, it is said:

"It is not entirely clear from the record that the juror stood in the relation of debtor and creditor with the bank, but, assuming that relationship, the legal right of defendant to challenge the juror upon that ground exists only within the time limited by the statute. The rule of the statute is, clearly, that neither party has a right of challenge, after the jury is completed. The authority of the court to discharge a juror during the trial is an entirely different matter from the legal right of a party to exercise a statutory challenge. The latter is defined and limited by positive law. The former is a discretionary power; inherent in courts. The latter may be exercised only within the limitations of the statute. The former is exercised whenever, in the opinion of the court, 'there is a manifest necessity for the act, or the ends of justice would otherwise be defeated.' *United States* v. *Morris,* Fed. Cas. No. 15,815, 1 Curt. 23; *Commonwealth* v. *McCormick,* 130 Mass. 61, 39 Am. Rep. 423.

"When the fact appears that the juror stands in the relation of debtor and creditor with the person alleged to have been injured by the offense charged, a challenge upon that ground made within the time limited by the statute must be allowed, even though the relationship is formal and trivial, or the implication of bias therefrom overthrown. But a challenge or objection to a juror made after the jury is completed is not a strict legal right, but is addressed to the sound discretion of the court, and it must rest upon substantial grounds.

"In this case the objections to the juror were not sufficient to require the court to interrupt the trial and discharge him, and there was no abuse of discretion when the objections were overruled."

Upon the authority of the foregoing cases from this jurisdiction, defendant must fail in his contention that he is entitled to a new trial merely because one of the jurors was indebted to Mr. Siddoway where such juror was not examined touching that subject-matter.

It is earnestly urged on behalf of appellant that the evidence offered at the trial was insufficient to sustain the verdict. Especially is it contended that the evidence fails to show the crime charged was committed in the county of Uintah where the defendant was informed against and tried. The evidence offered by the state tends to ■■ establish these facts: That at the time of the commission of the alleged crime, and prior thereto, the Siddoways ranged their sheep on the Uintah Mountains in Uintah

county, Utah. The northern boundary of their range extended to the boundary line between Uintah and Daggett counties. That adjoining the territory where the Siddoway sheep ranged and to the north thereof in Daggett county, Utah, the defendant ranged his sheep; that on or about September 10, 1933, the Siddoways drove their sheep to a corral in what is known as Lansing Draw on Diamond Mountain, in Uintah county; that one of the purposes of driving the sheep belonging to the Siddoways into the corral was to remove from their herd stray sheep which might be found in their herd; that the defendant was present when the Siddoways' sheep were placed in the corral; that when the stray sheep were separated from the sheep owned by the Siddoways, the defendant claimed eight head of such strays; that he tied them down and began loading them into a trailer attached to his automobile when a controversy arose over the ownership of the six sheep involved in this controversy; that the earmarks on each of the six sheep had recently been altered and branded as alleged in the information; that earmarks had been altered about two weeks prior to the time they were placed in the corral as evidenced by the fact that the ears had fresh scabs on them and when the ears were pressed blood oozed out of them where they had recently been cut; that wool brands of fresh red paint had recently been placed on the sheep, which fact was made evident because when the paint was handled it stained the fingers and hands; that when the Siddoways branded their sheep after they were sheared in the spring, they used green paint; that some of the sheep in controversy appeared to have the Siddoway brand under the brand of fresh red paint; that the fresh brands on the sheep were the brand used by defendant on his sheep, and he stated that he had marked and branded the sheep; that when defendant was accused of attempting to steal the sheep, he stated that he did not want any trouble and was willing to fix it up; that one of the sheep which had recently been branded and marked was a spring lamb which was still sucking a ewe

belonging to the Siddoways. The defendant offered evidence tending to show that during the summer of 1933 he kept nineteen sheep at his home in Vernal; that he had purchased sheep from various persons but he had not purchased any sheep within a year prior to the time of the commission of the alleged offense; that the sheep so purchased had various earmarks; that he intended to change the earmarks on his sheep so that the same would be uniform; that after the sheep which defendant kept at his home in Vernal were sheared in the spring of 1933, the wife of the defendant branded them with green paint; that from time to time beginning with July of 1933, the defendant hauled the sheep which he had theretofore kept at his home in Vernal to his range in the southern part of Daggett county, where he marked and branded them and turned them into his herd.

Upon this evidence the jury was justified in finding that the sheep in controversy were not the sheep which the defendant claimed he kept at his home in Vernal, and which, according to his testimony and that of his wife, were marked and branded in Daggett county. The jury was entitled to believe it quite improbable that the lamb which had recently been marked and branded was one of the sheep which defendant had kept at his home in Vernal. It is a matter of common knowledge that a ewe will not assume the role of a mother to a lamb not her own, especially after the lamb is several months old. Moreover, the state's evidence tends to show that the sheep in question had not been sold by the Siddoways; that they belonged to them at the time they were marked and branded; and that they had been marked and branded about two weeks before September 10, 1933. There were four witnesses produced by the state who testified that defendant admitted that he marked and branded the sheep in question and he did not deny having so admitted.

There is no direct evidence as to where the sheep were marked and branded if, as the jury must have found, the sheep were not the property of the defendant. There is

evidence, however, that the herd in which the sheep in question were found on September 10th, were ranging in Uintah county at the time they were marked and branded. There is also evidence tending to show that the sheep in question were in the Siddoway herd in the spring or early summer when they were branded and the ears marked. It thus being made to appear that a short time before and a short time after the alleged offense was committed, the sheep in controversy were in a herd which at all times was ranging in Uintah county, it may not be said, as a matter of law, that the evidence is insufficient to support a finding that the sheep were marked and branded in Uintah county.

It is earnestly urged on behalf of appellant that the court below committed prejudicial error in its instructions to the jury touching the question of where they must find the crime, if any, was committed before a verdict of guilty could be rendered. In instruction No. 1 the court told the jury that the defendant was charged with having committed the crime of altering the marks and brands of the sheep "in Uintah County, State of Utah, near the boundary line of Uintah and Daggett Counties, State of Utah," and that before the defendant could be found guilty it was necessary for the State to prove all of the material allegations of the information to the satisfaction of the jury beyond a reasonable doubt. In instruction No. 2 the court informed the jury that one of the material allegations of the information was that the crime charged was committed "within Uintah County, State of Utah." We quote the whole of instruction No. 9:

"You are instructed that it is the law of this State that when a public offense shall have been committed near the boundaries of two or more counties, the jurisdiction shall be in any of such counties. And in this connection, you are further instructed that the legislature has established the boundary line between Uintah County and Daggett County near the allotments of the Forest Reserve of the Siddoway and McNaughtan allotments, to be the watershed of the Uintah Mountains.

"And you are further instructed that, in order to find the defendant guilty, you must believe from the evidence beyond a reasonable doubt, not only that the crime was committed in Uintah County, Utah, but that all the material elements in the information are so established."

Counsel for defendant took exception to that part of instruction No. 1 which reads,

"near the boundary line of Uintah and Daggett Counties, State of Utah," "for the reason that there is no instruction in the record which defines what distance or where or how far from the county line that the jury can consider it as 'at or near' to the county line. * * * That the matter of 'at or near' the Daggett-Uintah County line is left to the speculation and conjecture of the jury to determine what distance 'at or near' to a county line is."

Defendant also took exception

"to instruction No. 9, for the reason that the same is contrary to the evidence and against the law, and especially because there is no evidence in the record which shows or tends to show that any act charged in the information was committed within the boundary of Uintah County, but the evidence clearly shows without contradiction that no crime was committed in Uintah County, and if any crime was committed, it was committed in Daggett County, Utah."

It will be noted that by the language used in instructions Nos. 1 and 2, the jury were informed that before they could convict the defendant they must find beyond a reasonable doubt that such crime was committed in Uintah county, Utah. Instruction No. 9 is to the same effect. While the jury was told in the latter instruction that a crime committed near the boundary line of two or more counties may be prosecuted in either county, still the court informed the jury later in that instruction that before they were warranted in finding the defendant guilty they must find beyond a reasonable doubt that the crime was committed in Uintah county, Utah. Article 1, § 12, of our State Constitution provides that:

"In criminal prosecutions the accused shall have the right * * * to have a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed."

We have a statute, R. S. Utah 1933, 105-8-4, which provides:

"When a public offense is committed near the boundary of two or more counties the jurisdiction is in any of such counties."

It will be observed that the defendant directs his complaint to that part of instruction No. 9, which is merely a statement of the law just quoted. No claim is made that such law contravenes the constitutional provision heretofore quoted. It is argued at some length that the court should have given the jury definite instructions as to how far within Daggett county the crime may be committed and still leave the jurisdiction to prosecute the same in the district court of Uintah county. Had the defendant made a proper request for an instruction touching that subject-matter, it should have been given; but he made no such request. The court having told the jury in its instructions to them that before they could find the accused guilty of the crime charged they must find beyond a reasonable doubt that he committed the same in Uintah county, Utah, it is difficult to perceive how he was prejudiced by the instructions complained of. The instructions were not a misstatement of the law, and while not necessary they could not well be said to mislead the jury. Upon his own theory the instructions touching the place where the crime is alleged to have been committed were as favorable to the defendant as he was entitled to have them.

Appellant also complains of instruction No. 6 which reads as follows:

"I charge you that the State must establish by competent evidence to your satisfaction beyond a reasonable doubt every essential element of the crime charged. Intent is one of the essential and material ingredients of the offense contained in the information; and the intent

to steal the sheep described in the information, or one or more of said sheep, by altering or defacing the marks or brands, or to prevent the identification thereof by the true owner must be established by the State to your satisfaction beyond a reasonable doubt. You are further instructed that if you find the defendant did mark and brand said sheep, or alter or deface the marks or brands on one or more of said sheep, as charged in the information, but the jury have a reasonable doubt as to whether or not such intent to steal existed in the mind of the defendant at said time, then it will be your duty to find the defendant not guilty."

Exception was taken to the whole of the foregoing instruction and to that portion thereof which reads:

"You are further instructed that if you find the defendant did mark and brand said sheep, or alter or deface the marks or brands on one or more of said sheep, as charged in the information * * *."

The statute under which this prosecution was had provides as follows:

"Every person who marks or brands, or who alters or defaces the mark or brand on any * * * sheep * * * belonging to another, with intent thereby to steal the same, or to prevent identification thereof by the true owner, shall be punished as in cases of grand larceny." R. S. Utah 1933, 103-34-8.

It is urged by the defendant that the information charges him with altering marks and brands on the Siddoway sheep with the intent to steal the same, while instruction No. 6, just quoted, permits the jury to find him guilty if they should find that he merely intended to prevent the identification of the sheep by the true owner. The charge in the information is that the sheep were marked and branded with the intent to steal the same. There is no charge that the sheep were marked and branded for the purpose of preventing the identification thereof. It is not contended by defendant, nor could it be successfully contended, that the whole of instruction No. 6 is vulnerable to attack. In his brief, appellant complains only of that portion of the instruction which reads "or to prevent the identification thereof by

the true owner." It will be noted that no objection was made at the trial specifically to that part of the instruction which defendant now complains of. The law is well settled in this jurisdiction that an objection and exception to the whole of an instruction is of no avail unless the whole is bad. It is likewise well settled that an objection and an exception to a part of the charge must be specific as to the part objected to. *Farnsworth* v. *Union Pac. Coal Co.*, 32 Utah 112, 89 P. 74; *Grow* v. *Utah Light & Ry. Co.*, 37 Utah 41, 106 P. 514; *Rampton* v. *Cole*, 52 Utah 36, 172 P. 477; *McLaughlin* v. *Chief Consol. M. Co.*, 62 Utah 532, 220 P. 726. The complaints now made against instruction No. 6 were not called to the attention of the trial court by the ojections and exceptions taken to the instruction, and therefore not properly before us for review. Moreover, the language of the instruction now under review could not well have misled the jury.

The judgment of the lower court is affirmed.

FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.

WOLFE, Justice (dissenting).

I dissent. I think the question put to one of the jurors as to whether or not he was indebted to the Uintah State Bank should have been allowed. It may not have appeared until later that one of the complaining witnesses, W. H. Siddoway, was the president of the bank, but the revealing of that very fact was prevented by the court's refusing to permit the juror to answer the question. If he had been allowed to answer it, it would have revealed that he was indebted to the bank and immediately counsel for the defense most probably would have asked him whether the fact that Wm. H. Siddoway was president of the creditor bank would influence him. Moreover, the question suggested that defendant was endeavoring to inform himself as to some fact on which he might desire to exercise a peremptory challenge. It is not to be presumed that counsel would ask a wholly immater-

ial question and the nature of the question would suggest where the inquiry was headed. Certainly, the questions which the court desires to ask on voir dire in a criminal action, or may permit the defendant and prosecution to ask, lie largely within the discretion of the court. But where it is quite apparent that the matter in regard to which a party desires to inquire is necessary or highly desirable for counsel to know in order to exercise peremptory challenges and such as would form a reasonable or intelligent ground for the exercising of such challenges, the court should make or permit the inquiry to be made.

In the case of *Balle* v. *Smith,* 81 Utah 179, 17 P. (2d) 224, 230, it was stated:

"The object of an examination of a juror on his voir dire is to ascertain whether he has the statutory qualifications of a juror, and, having the statutory qualifications, whether there are grounds for a challenge for either actual or implied bias and to enable the party to exercise intelligently his peremptory challenges. *State* v. *Morgan,* 23 Utah 212, 64 P. 356; *Pavilonis* v. *Valentine,* 120 Ohio St. 154, 165 N. E. 730. We hold, therefore, following the great weight of authority and the better reasoning, that counsel for plaintiff is entitled to learn whether any juror is interested in or connected with any insurance or casualty company that may be interested in the case as insurer of defendant's liability."

If a party has the right to know whether any venireman is interested in an insurance company which is a virtual defendant in the case, by the same token a defendant in a criminal action should be permitted to inquire whether any of the persons are debtors of an institution in which a complaining witness holds a high office. If one who is sued for negligence held an office in a corporation, would not the plaintiff in such accident case have the right to determine whether any of the veniremen worked for such corporation? In effect, the prosecution's witness is a party to the action for the purpose of determining whether to exercise a peremptory challenge or one for cause.

I think the case should be reversed on another ground. While I agree that the shaking of hands by a complaining witness with the jurymen, nor perhaps the failure of a venireman to speak up when she knows she is indebted to the complaining witness and all around her the others have been asked about the debtor and creditor relationship, might not each in itself be a ground for reversal, yet when the aggregate effect of several of them put together may have resulted in an unfair trial, I think the case should be reversed. I do not mean that a number of erroneous but unprejudicial rulings may be added together to work a reversal when none in itself would do so, but when there are incidents of misconduct before the jury or rulings in constituting the jury which affect its personnel, none of which is itself important enough to be a ground for reversal, but which in the aggregate were likely to result in an unfair trial, I think the case may be reversed. I see a difference between matters which in a sense are insulated from the minds of the jury, such as rulings on technical questions of law, and a series of incidents which directly offset the type of fact finders which are selected or the cumulative effect of which might readily tend to incline the minds of the jurymen to one side or the other independently of the evidence. At bottom the jurors are judges of the fact. Those matters which go to the selection of such judges or which influence the minds of such judges—the psychological elements—when frequent or accumulative, may result in unfairness in the selection or functioning of these judges.

For these reasons I dissent.