# United States Court of Appeals
## For the First Circuit

No. 02-1643

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL NEWTON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya and Lipez, Circuit Judges.

Michele J. Woods, with whom Joshua D. Franklin was on brief, for appellant.
Mark E. Howard, Assistant United States Attorney, with whom Thomas P. Colantuono, United States Attorney, was on brief, for appellee.

April 29, 2003

**LIPEZ, Circuit Judge**.  This appeal involves, in part, the unusual claim that the defendant Michael Newton's retrial was barred by the Double Jeopardy Clause, U.S. Const. amend. V, because the trial judge intentionally provoked his request for a mistrial.

## I.  Background

Newton was indicted with Wyman Hogan, Ernest Membrino and Edward Hall on October 12, 2000, by a federal grand jury sitting in the District of New Hampshire, and charged with conspiracy to possess with intent to distribute and to distribute fifty grams or more of cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and 846.  The facts of the conspiracy pertain to an extensive operation of buying powder cocaine, manufacturing crack cocaine, and selling both powder and crack cocaine from a number of residences in and around the Keene, New Hampshire area.  Newton was primarily charged in connection with the sale of cocaine in Keene, but outside of the residences allegedly controlled by the conspiracy's crack cocaine distribution operation.

On January 2, 2001, prior to jury selection, co-defendant Edward Hall notified the district court that he would present a defense that would portray the co-defendants in an unfavorable light, and moved to sever his case from the other defendants.  The district court denied this motion.  The other three co-defendants then moved for severance.  The district court likewise denied their

motion and proceeded to trial. After the jury was sworn, defendant Hall's counsel delivered an opening statement that corroborated much of the government's version of events. The other co-defendants renewed their request for severance and moved for a mistrial, which the district court granted. The retrial commenced on January 16, 2001, and resulted in Newton's conviction for conspiracy to distribute more than fifty grams of crack cocaine. On May 16, 2001, Newton was sentenced to two hundred and thirty-five months' imprisonment, to be followed by five years of supervised release.[1]

Newton appeals both the conviction and the sentence, arguing that his retrial after an initial mistrial was prohibited by the Double Jeopardy Clause, U.S. Const. amend. V, that the prosecutor violated Newton's Fifth Amendment right to remain silent by impermissibly commenting during closing argument on Newton's failure to testify, and that the district court committed an error

---

[1] Hogan was found guilty of conspiracy to possess with intent to distribute more than fifty grams of a substance containing amounts of cocaine and cocaine base, and possession of cocaine base. He was sentenced to two hundred and sixty-two months' imprisonment, to be followed by five years of supervised release. Membrino was found guilty of conspiracy to possess with intent to distribute more than fifty grams of a substance containing amounts of cocaine and cocaine base and was sentenced to one hundred and fifty-one months' imprisonment, to be followed by five years of supervised release. Hall was tried separately and convicted of managing a residence for the purpose of manufacturing, storing, distributing and using cocaine and cocaine base. He was sentenced to twenty-four months of imprisonment and three years of supervised release.

of law during sentencing by failing to exercise independent judgment on evidence presented pertinent to sentencing.  For the reasons stated below, we affirm Newton's conviction and decline to set aside his sentence.

## II.  Double Jeopardy

The Double Jeopardy Clause of the Fifth Amendment protects a defendant in a criminal proceeding against repeated prosecutions for the same offense.  United States v. Dinitz, 424 U.S. 600, 606 (1976).  However, the Double Jeopardy Clause is not an absolute bar to successive trials.  Justices of Boston Municipal Court v. Lydon, 466 U.S. 294, 308 (1984).  The protection embodied in the Double Jeopardy Clause is a personal defense that may be waived or foreclosed by a defendant's voluntary actions, including a request for, or effectual consent to, a mistrial.  United States v. DiPietro, 936 F.2d 6, 9 (1st Cir. 1991).  Thus, in this case of retrial following the declaration of a mistrial, the key question for double jeopardy purposes is whether the mistrial was declared with the defendant's consent.

> If a mistrial is declared with the defendant's consent, she is deemed to have waived any double jeopardy claim she might otherwise have.  If, on the other hand, the defendant wishes to proceed to a verdict by the jury empaneled to try her, and the court declares a mistrial over her objection, the Double Jeopardy Clause will bar the defendant's retrial unless manifest necessity required the court to so act.

<u>United States</u> v. <u>Aguilar-Aranceta</u>, 957 F.2d 18, 22 (1st Cir. 1992) (citing <u>Dinitz</u>, 424 U.S. at 608).   The only circumstance in which the defendant's consent to a mistrial does not operate as a waiver of her right to claim double jeopardy is where the prosecutor or the judge intentionally provokes the defendant to request the mistrial:  "the circumstances under which [] a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was <u>intended</u> to provoke the defendant into moving for a mistrial." <u>Oregon</u> v. <u>Kennedy</u>, 456 U.S. 667, 678 (1982) (emphasis added).   Here, Newton insists that the trial judge intentionally provoked his mistrial request.

## A.   Sequence of Events

To evaluate Newton's claim we must examine closely the sequence of events that prompted the judge to declare a mistrial, and what transpired between the judge and Newton's trial counsel. Defendant Hall's counsel first raised the issue of severance immediately prior to jury selection.  Based on the vague assertion of a defense strategy that would be antagonistic to the other defendants, Hall's counsel requested that Hall be severed from the other three defendants.  After requesting but failing to obtain details elucidating the proposed defense, the trial judge denied the motion.  The three other defendants then made a joint motion to

-5-

sever based on Hall's request. The judge similarly denied this motion and proceeded to empanel the jury and begin the trial.

During his opening statement, Hall's counsel characterized Hall as "a victim . . . not a criminal" and claimed that Hall "was used" by his codefendants. There were no immediate objections by the other defendants to the defense outlined in Hall's opening statement. The following morning, however, counsel for one of the other defendants noted Hall's antagonistic defense and raised the possibility of renewing the motion to sever Hall from the trial. Newton's counsel joined in the renewed motion. The judge reserved ruling on the motion until the afternoon.

That afternoon, during an extensive colloquy on the motion to sever, the judge explained to defense counsel his position on the motion:

> I will not grant any motion to sever unless I do an individual inquiry with each defendant and ascertain from each defendant that they understand what this means; that their case is being severed that a mistrial is being granted that they are waiving any double-jeopardy claim that they may have; that they fully understand that if they want to go ahead with trial with the current jury, they can.
>
> . . .
>
> [I]f I were to grant a mistrial based on the defendants' request for a mistrial because of the failure to grant severance and the trial evidence jointly being prejudicial to the defendants in their eyes, I could grant that request and not make a finding of manifest necessity, and notwithstanding the absence of a finding of manifest necessity, the

> defendants could be reprosecuted, notwithstanding the double-jeopardy clause.

In other words, the judge was telling the defendants that if they requested a mistrial and he granted this request despite the absence of manifest necessity for declaring such a mistrial, the Double Jeopardy Clause would not bar their reprosecution. Counsel for one of the other defendants immediately interjected: "we don't agree with that . . . if the case law supports the position that this trial has gone so far that jeopardy has attached . . . and that they're unable to be retried again and that it should be with prejudice, of course, we're not waiving that." Realizing that the defendants did not seem to understand the relationship between their request for a mistrial and their waiver of the double jeopardy bar, the court offered further explanation:

> Supreme Court precedent makes very clear that where a defendant requests a mistrial, he waives any right he has to assert that a reprosecution gives rise to a double-jeopardy violation . . . I can grant a mistrial over a defendant's objection without presenting a double-jeopardy question, only where there is a manifest necessity . . . I don't think I could make a manifest necessity finding here unless I could conclude that there was an overwhelming probability that the jury could disregard my instructions to disregard any comments in [Hall's] opening statement. . . I couldn't make that finding. I couldn't find manifest necessity.

Based on this determination that there was no manifest necessity for a mistrial, the judge thoroughly explained to the defendants their options regarding severance and mistrial:

-7-

> If [Hall] wants a mistrial and severance and all three [other] defendants want a mistrial and severance I could do either of two things. I could either grant the severance motion and mistrial as to [Hall] and proceed to trial with the three defendants, giving a limiting instruction to the jury to disregard [Hall's] opening statement, or I could grant a severance and mistrial as to the three defendants, continue on with [Hall] and give an instruction to the jury to disregard any evidence that we determine is admissible against the three but not against [Hall].
>
> I at this time am not persuaded by any argument that the defendants may have that mistrial is absolutely required because there's manifest necessity for a mistrial, but nevertheless, if they want a mistrial and there's a potential for reprosecution and double-jeopardy issues are plainly addressed, I'm willing to consider granting everyone mistrials and just starting again with separate trials for the two groups.

The judge then addressed each attorney individually to ascertain how the defendants wished to proceed.

> The Court: Let me hear from the defendants. Let me go through one at a time. [Counsel for Membrino], what does your client wish to do?
>
> Counsel 1: Mr. Membrino has informed me that he wishes to sever the trial and he will waive his right to a --
>
> The Court: So he wants to sever and ask for a mistrial.
>
> Counsel 1: Sever and a mistrial, yes, your Honor.
>
> The Court: All right. What does your client want to do, [Counsel for Hogan]?

```
Counsel 2:    Judge, I've conferred with him.
              Based upon the readings from the
              Court as to what the status of the
              law is on that, we're willing to -
              - what we want to see done is the
              case be severed, mistrial and
              severance.  He will waive his --
              he will not assert his rights to
              double jeopardy.

The Court:    All right.   And  [Counsel for
              Newton], what do you want to do?

Counsel 3:    We'd like to sever Mr. Hall and
              proceed.

The Court:    And proceed?

Counsel 3:    Or  to  have  a  mistrial with
              prejudice.  He does not want to
              waive his right to any claims.
```

Thus, at this point, two of the remaining defendants requested severance of Hall and a mistrial, whereas Newton requested severance of Hall and continuation of the trial before the empaneled jury.  The judge understood Newton's alternate request for "mistrial with prejudice" to mean that if the judge granted a mistrial and forced Newton to go to trial later with a new jury, it would be over Newton's objection and that therefore, since the judge had already determined that there was no manifest necessity for a mistrial, double jeopardy might bar Newton's retrial.

With only Newton wishing to proceed with the empaneled jury, the judge made clear that he accepted the need for two trials -- one for Hall and another for the other three defendants -- but that he was "not going to . . . go through two separate trials for

that group of three."  The three remaining defendants would be tried together, either now with the empaneled jury or later with a new jury.  He would not permit three trials: one for Newton before the empaneled jury, a separate trial for Hall before another jury, and a third trial for the other two defendants before yet another jury.  Because of this requirement that the three remaining defendants be tried together, and because he would not grant Newton a mistrial over his objection, the judge confronted Newton with a choice:  he could persist in his desire to be tried before the empaneled jury and thereby override the requests of the other two defendants for a mistrial and a trial before a different jury; or he could join them in their requests for a mistrial and hence waive any claim that double jeopardy bars retrial.  After a brief conference with the other defense attorneys, Newton's attorney indicated that Newton would "waive his double jeopardy rights and ask for a mistrial."

Before accepting this choice, the district court was commendably careful to ensure that the defendant understood the consequences of his decision to request a mistrial.  In an extended colloquy, the judge ascertained that Newton understood that he has a constitutional right not to be tried twice on the same charge and that by choosing to move for a mistrial, Newton would be giving up this right:

> The Court:  . . . But if you don't want a trial now, you have to understand

-10-

> that you will be retried again and you will give up your right to claim double jeopardy -- that double jeopardy prevents your retrial. Do you understand that?

> Newton: Yes, I do.

> The Court: Are you willing to give up that right?

> Newton: Yes.

After this clarification of the consequences of requesting a mistrial, there was no further talk by Newton of a mistrial with prejudice.

## B. Legal Analysis

On appeal, accepting that he "reluctantly agreed to waive his double jeopardy rights," Newton now argues that the trial judge "induced" him to do so by exerting pressure on him to request a mistrial to avoid the consequences of the judge's error in the denial of the pre-trial motion to sever "despite numerous warnings from counsel for Mr. Hall regarding Mr. Hall's anticipated defense strategy." He elaborates on this renewed demand for a "mistrial with prejudice" as follows:

> In the wake of that error and consequent prejudice introduced in the opening statement of Mr. Hall's counsel, the trial court should have known that any conviction arising out of the first trial likely would be reversed. As such, the trial court presented Mr. Newton with an ultimatum -- continue with an irreparably prejudiced trial, at which Mr. Newton had already been implicated by a co-defendant, or consent to a mistrial. Mr. Newton was essentially forced to forego his

-11-

right not to be tried more than once in order to minimize the significance of the trial court's otherwise obvious error.

Newton sees in this scenario a judge who "intended to provoke the defendant into moving for a mistrial," and thus argues that his case falls within the "narrow exception" carved out by Oregon v. Kennedy to the rule that "where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." Dinitz, 424 U.S. at 607.

Newton's "intentional provocation" scenario is a creative rewriting of what transpired at trial. The trial judge confronted Newton with a choice, not an ultimatum: he could be tried before the empaneled jury with the other two defendants, or he could join them in requesting a mistrial, waive his double jeopardy rights, and be tried with them before a new jury at a later date. However, the mere fact that Newton was offered a choice of two imperfect options does not imply compulsion. "The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose."

-12-

McKune v. Lile, 536 U.S. 24, 41 (2002) (quoting McGautha v. California, 402 U.S. 183, 213 (1971)) (internal quotation marks omitted).

If there was any pressure on Newton as he considered the choice posed by the court, it came from the co-defendants who preferred a mistrial. However, the opportunity for Newton to proceed with the empaneled jury remained, and there is no indication that, of the two options available to Newton, the judge preferred a mistrial for which he saw no manifest necessity. Indeed, when Newton first indicated that he wanted to proceed with a limiting instruction before the empaneled jury, the judge immediately determined that

> the thing to do is to consider a potential severance and mistrial as to [Hall] and try the other three together. And they're asking me for a mistrial, and I would deny it on the grounds that there isn't manifest necessity, and I will instruct the jury to disregard.

The essence of the double jeopardy protection is the right to be tried by the jury initially empaneled unless manifest necessity requires otherwise. United States v. Jorn, 400 U.S. 470, 484 (1971) ("[W]here the judge, acting without the defendant's consent, aborts the proceeding, the defendant has been deprived of his 'valued right to have his trial completed by a particular tribunal'") (quoting Wade v. Hunter, 336 U.S. 684, 689 (1949)). To this end, the judge took note of the principle articulated in Scott, that "the important consideration for purposes of the Double

-13-

Jeopardy Clause is that the defendant retain primary control over the course to be followed in the event of [] error." United States v. Scott, 437 U.S. 82, 93-94 (1978). Hence, the judge made clear his willingness to issue a limiting instruction and proceed with the jury already empaneled, thereby preserving Newton's right to be tried by the original jury and belying Newton's claim that he was provoked into requesting a mistrial. Although he specifically found that there was no manifest necessity for judicial declaration of a mistrial, the judge told the defendants that he would grant their requests for a mistrial so long as they understood that they were waiving any double jeopardy claim. By giving the defendants this mistrial option, the judge gave the defendants more latitude than was strictly necessary in determining the course of their trial.

When Newton's attorney indicated Newton's preference for a new trial, the judge specifically asked her whether she felt that "any improper pressure ha[d] been brought to bear." She replied that she did not. Nevertheless, the judge agreed to grant a mistrial only after adequately informing Newton of the ramifications of requesting a mistrial and determining that "all of the defendants have knowingly, voluntarily and intelligently waived their right to claim double jeopardy as a bar to a second prosecution." Newton cannot undo the trial judge's scrupulous attention to the double jeopardy issue with his revisionist account

of the trial.  By electing to request a mistrial, Newton waived any double jeopardy claim.  His challenge to his retrial and subsequent conviction on this ground must fail.

### III.  Closing Arguments of the Prosecutor

Newton claims that he deserves a new trial because of prosecutorial misconduct arising from statements made to the jury during closing arguments.  Since Newton did not make a contemporaneous objection to these statements, we review for plain error the question of whether the prosecutor impermissibly commented on Newton's failure to testify.  United States v. Roberts, 119 F.3d 1006, 1013-14 (1st Cir. 1997).  Under plain error review, "the appellant must show (1) the occurrence of an error; (2) that the error is obvious or clear under current law; and (3) that the error substantially and adversely affects the rights of the appellant."  Id. at 1014.  Remedial discretion in the face of plain error should be exercised "if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 736 (1993) (citations omitted).  Because the comments of the prosecutor were not improper, we find no error at all in the trial judge's failure to address these comments sua sponte.

Newton points to two comments made by the prosecutor during his rebuttal to the defendants' closing arguments.  These comments must be evaluated in the context of Newton's defense as

advanced in his closing argument. Newton did not present witnesses or his own testimony to deny his use or possession of drugs.[2] Instead, his defense focused on the charge of conspiracy, highlighted the lack of evidence of an agreement between the alleged co-conspirators, and questioned the motives of the co-operating witnesses. Specifically, in her closing, Newton's counsel said to the jury:

> The U.S. Attorney's office has bought testimony from liars, from thieves, from addicts, from dealers, from desperate, desperate people. From people who but for their ability to come in here and say what the U.S. Attorney wants, would most likely spend a significant amount of time in jail.

In his rebuttal to this closing argument, the prosecutor asked: "Is there any testimony in this case that points otherwise, that really points to other people who may have been the leaders, organizers of this conspiracy besides these three. I would suggest to you that there was none."

In her closing argument, Newton's attorney also asserted: "Mike Newton was a working man. He worked and we know that because you'll see his tax records, tax returns in evidence."[3] In response

---

[2] Newton was the only defendant who called a witness -- Glenn Marchand, an ex-police officer who had an interaction with one of the prosecution witnesses. Although it is not entirely clear, the apparent purpose in calling Marchand was to challenge the credibility of the prosecution witness.

[3] Although Newton's 1998 tax returns were listed on the Government's Exhibit List, we find no indication that they were introduced at trial. Neither party makes an issue of this possible

-16-

to this argument, the prosecutor stated at the close of his rebuttal:

> [Defense Counsel] says, well, my client was working and -- because that's what the tax records show. If you look at those tax records, you will see I believe on the 1999 tax record, it says auto mechanic. Ask yourself was there any testimony in this case indicating that he was involved in repairing cars or anything of that like. I just want to leave you with that thought.

Newton argues that this statement and the prior one by the prosecutor constituted prohibited comment on his exercise of the right to remain silent.

It is well-established that "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." <u>Griffin</u> v. <u>California</u>, 380 U.S. 609, 615 (1965). A prosecutor's comment does not need to be direct; rather, a prosecutor may run afoul of the rule in <u>Griffin</u> by making such comments inferentially. <u>See</u>, <u>e.g.</u>, <u>Glantz</u> v. <u>United States</u>, 810 <u>F.2d 316, 322</u>. Nevertheless, as we have pointed out repeatedly, the standard is:

> Whether, in the circumstances of the particular case, the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.

---

oversight.

-17-

Id. (internal quotations omitted); accord United States v. Taylor, 54 F.3d 967, 979 (1st Cir. 1995). Moreover, "when a prosecutor's comments, fairly viewed, are susceptible to two plausible meanings, one of which is unexceptionable and one of which is forbidden, context frequently determines meaning." Taylor, 54 F.3d at 979. In addition, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974).

With these rules as our guide, we conclude readily that the prosecutor's comments did not run afoul of the Fifth Amendment. To support his claim, advanced in closing argument, that the tax records established that he was a working man with a source of income – namely, an auto mechanic - Newton "would not have had to rely on his own testimony." United States v. Bey, 188 F.3d 1, 9 (1st Cir. 1999). Knowledge of his work would easily have been within the competence of other witnesses who could have testified at the trial. Hence, this is not a situation "when contradiction [of the government's case] would have required the defendant to take the stand," United States v. Flannery, 451 F.2d 880, 881 (1st Cir. 1971), and hence the prosecutor's question in rebuttal ("Ask yourself was there any testimony in this case indicating that he was involved in repairing cars or anything of that like.") did not

-18-

constitute inappropriate comment on the defendant's failure to testify.  See Bey, 188 F.3d at 9; Flannery, 451 F.2d at 882.

When the prosecutor asked in rebuttal if there was any testimony in the case that "really points to other people who may have been the leaders, organizers of this conspiracy besides these three," he was responding to the theory of the defense, also advanced in closing argument, that the prosecution witnesses who testified about the role of the defendants in the drug conspiracy should not be believed because they were "liars . . . thieves . . . addicts . . . desperate, desperate people."  Viewed in context, the prosecutor's question is a "comment on the plausibility of the defense theory . . . [T]he government is entitled, to some extent, to comment on a defendant's failure to produce evidence supporting the defense theory of the case."  Glantz, 810 F.2d at 321.  Hence the comment at issue did not constitute improper comment on Newton's exercise of his Fifth Amendment rights.

## IV.  Sentencing

Newton was convicted by the jury of conspiracy to distribute more than fifty grams of crack cocaine.  In response to a special question on the verdict form, the jury specifically found that "Michael Newton reasonably foresaw while he was a member of the conspiracy that the conspirators possessed with intent to distribute and/or intended to possess with intent to distribute fifty grams or more of crack cocaine as part of the conspiracy."

-19-

Based on this finding, the prosecution argued at sentencing that the weight of "all buys occurring during the course of the conspiracy . . ." should be attributable to him for sentencing purposes.

The sentencing judge found "by a preponderance of the evidence" that one hundred and fifty grams of crack was attributable to Newton based on the fact that he was a member of the conspiracy:

> The conspiracy was to distribute in excess of one hundred and fifty grams of crack. While Mr. Newton was a member of the conspiracy, he could reasonably foresee that in fact that was the objective of the conspiracy during the time that he was a member of it, and therefore it is my judgement that that crack should be attributed to him for purposes of sentencing."

Based on this finding, the judge gave Newton "the lightest sentence for a level thirty six, criminal history category three defendant that I can give you, which is two hundred and thirty-five months." He added that, even if he had found that only fifty to one hundred and fifty grams of crack cocaine had been attributable to Newton, he "still would have given him a two hundred and thirty-five-month sentence because two hundred and thirty-five months would have been within the applicable range there."

Newton argues that his sentence should be vacated because the district court erred as a matter of law by failing to "exercise independent judgment" in its consideration of evidence pertinent to sentencing. The sentencing court's duty "independently to consider

-20-

proffered information that is relevant to matters of consequence in the sentencing determination," <u>United States</u> v. <u>Tavano</u>, 12 F.3d 301, 307 (1st Cir. 1993), derives from the Due Process Clause, which guarantees every defendant a "right to be sentenced upon information which is not false or materially incorrect." <u>Id.</u> at 305. Specifically, Newton argues that the district court improperly disregarded the testimony on the extent of Newton's involvement in and knowledge of the conspiracy, and failed to consider Newton's arguments on the quantity of drugs attributable to him for sentencing purposes.

Section 6A1.3 of the United States Sentencing Guidelines requires that "when any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor." U.S. Sentencing Guidelines Manual § 6A1.3(a) (2001). While this provision encompasses a duty to consider the information presented, <u>Tavano</u>, 12 F.3d at 306, it does not imply a "duty of blind acceptance." <u>Id.</u> at 307. After examining the relevant evidence, the sentencing court has broad discretion to "pick and choose" and ultimately credit trial testimony if it carries persuasive force in a particular case. <u>Id.</u>

Here, the district judge afforded Newton ample opportunity to submit arguments pertinent to sentencing and gave careful and thorough consideration to the arguments presented.

When it became clear during the initial sentencing hearing that there was a dispute as to the quantity of drugs that could be attributed to Newton for sentencing purposes, the court specifically deferred making a judgment on the weight of the drugs until it received supplemental memoranda from both the parties supporting their respective arguments.

Newton argues that the court ran afoul of its "duty to consider" by summarily disregarding both the memorandum Newton submitted on the drug quantity[4] and Hogan's testimony at the sentencing hearing regarding the extent of Newton's involvement in the conspiracy. However, unlike Tavano, where the district court "formulated a per se rule declaring trial testimony determinative of drug quantity, to the exclusion of all other evidence bearing up on the same set of transactions," Tavano, 12 F.3d at 304-05, the district court here carefully read Newton's memoranda and considered the evidence before making an independent determination that his arguments were without merit. The court not only allowed Hogan's testimony but it also questioned Hogan on the

---

[4] Newton initially submitted two memoranda but subsequently filed a motion to withdraw one. The court cautioned Newton that "the memo that you are left with takes a position that is frivolous based on the facts of this case and I will never accept it." Despite Newton's insistence that the memorandum the court deemed more beneficial to Newton be withdrawn, the court stated: "I've read [the withdrawn] memo, and if I think there's anything in it that will benefit Mr. Newton, I will give him the benefit of those arguments." This statement further demonstrates the court's willingness to consider the totality of the evidence presented.

inconsistencies between the testimony offered and the confession that he made during his own sentencing. Based on these discrepancies, the court found Hogan to be an unreliable witness and did not credit his testimony. These are precisely the determinations of fact that the sentencing court has discretion to make. Because it adequately considered the proffered evidence relevant to sentencing, the court did not offend the dictates of due process set forth in Tavano. Therefore, it did not err as a matter of law.

We review for clear error the court's factual determination on the quantity of drugs attributable to Newton for sentencing purposes. The court found by "a preponderance of the evidence" that, due to his membership in the conspiracy and the forseeability of the objectives of the conspiracy, 150 grams of crack were attributable to Newton. Contrary to Newton's argument, the sentencing court is not required to make explicit factual findings on the details of each transaction conducted in the course of the conspiracy, when such findings have been detailed at trial and in the submissions of the parties. Tavano, 12 F.3d at 307 ("As a general rule, a trial court lawfully may make implicit findings with regard to sentencing matters, incorporating by reference suitably detailed suggestions limned in the PSI Report or advanced by a party."). Thus, it was well within the bounds of the court's discretion to credit evidence produced at trial and set forth in

the government's sentencing memorandum.[5]   Therefore, we reject Newton's argument that the court erred in its determination of the quantity of drugs attributable to Newton for sentencing purposes.

## V.  Conclusion

The district court was thorough, fair and legally correct at all stages of Newton's trial.  For the reasons stated above, the judgment of the district court is **<u>affirmed</u>**.

---

[5] Newton complains that the court failed to resolve a dispute over conversion of powder cocaine to crack cocaine.  However, in the absence of expert testimony on the relative weights, the court did not consider the government's argument that Newton sold more than 150 grams of crack based on his purchase of more than 150 grams of powder cocaine.  Therefore, the court restricted its determination of the quantity of crack attributable to Newton to the amount sold by the conspiracy of which Newton was reasonably aware.  Because this removed from the sentencing equation the quantity of crack cocaine that could be made from the powder cocaine that Newton purchased, this decision not to make a conversion finding worked in Newton's favor.