

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-08-00041-CR
_____

### EX PARTE:  JASON WAYNE HUNTER

On Appeal from the 76th Judicial District Court
Titus County, Texas
Trial Court No. CR15,470

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss
Dissenting Opinion by Justice Moseley

OPINION

The jury was listening to the second witness testifying at the trial[1] of Jason Wayne Hunter on an aggravated sexual assault charge,[2] when a break in the proceedings was taken. During that break, it was discovered that one of the jurors had previously served on a grand jury that had earlier indicted[3] Hunter for the very crime being tried. After consulting with the parties immediately following this discovery, the trial court declared a mistrial.

Once the case was set for another trial, Hunter filed a pretrial application for writ of habeas corpus March 10, 2008. *See* TEX. CODE CRIM. PROC. ANN. art. 11.08 (Vernon 2005). The application asserted that the State's continued prosecution of Hunter for the current charge violates the Double Jeopardy Clauses of the Fifth and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 14 of the Texas Constitution. *See* U.S. CONST. art. 1, § 14. The application argued that both constitutions forbade a retrial because manifest necessity did not exist at the time the trial court declared a mistrial. Hunter's application offered no further

[1]Trial began the week of February 11, 2008. During jury selection, one or both sides asked prospective jurors whether anyone had served on the grand jury that returned an indictment against Hunter; none of the panel members responded affirmatively. The parties ultimately selected a jury, and a trial on the merits began that Wednesday.

[2]*See* TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(i), (2)(B) (Vernon Supp. 2007).

[3]The initial indictment (the one in which the problem juror participated) was ultimately dismissed but later replaced by a second indictment—from a different grand jury—that levied the same criminal charges against Hunter based on the same alleged assault. The second indictment was the charging instrument in the initial effort to try Hunter and is the charging instrument in the impending trial.

2

explanation of why manifest necessity did not exist, nor did it suggest any alternatives to granting a mistrial.

At a hearing on the application's merits, Hunter argued there was one alternative to declaring a mistrial and, therefore, manifest necessity did not exist to declare a mistrial. That alternative, argued Hunter, was using an alternate juror.[4] The trial court ultimately denied Hunter's pretrial application for writ of habeas corpus, a ruling Hunter now appeals to this Court.

The sole issue raised in this accelerated appeal is whether the trial court erred by denying Hunter's pretrial application for writ of habeas corpus based on his contention that the State's continued prosecution of the underlying case violates his federal and state constitutional protections against being twice tried for the same crime.[5] Concluding that we are constrained by the precedent of *Ex parte Fierro*, 79 S.W.3d 54, 56 (Tex. Crim. App. 2002), we hold that, because the trial court's

---

[4]The suggestion that using an alternate juror was an option available to the trial court—at the time of discovery of the juror's prior service on a grand jury that addressed Hunter's case—is, of course, incorrect. Had an alternate juror been selected with the jury, he or she could have been seated in place of the problem juror. But, in this case, no alternate juror had been selected. Thus, Hunter's suggestion was hindsight and did not suggest a viable alternative available to the trial court at the time it was faced with the problem. We will, however, use hindsight to suggest to trial courts that, when seating a jury, appointing at least one alternate juror is a valuable safety measure, to avoid just this sort of problem and to protect trial proceedings. *See* TEX. CODE CRIM. PROC. ANN. art. 33.011 (Vernon Supp. 2007).

[5]Hunter makes no effort to distinguish the rights, protections, and privileges afforded by the Federal Constitution from those guaranteed by Texas law. We will, therefore, proceed under the presumption that our state charter and laws afford no greater rights than those guaranteed under federal law. *Cf. Wood v. State*, 18 S.W.3d 642, 648 n.5 (Tex. Crim. App. 2000) (where appellant's brief makes no distinction between federal and state protections, review federal only).

3

sua sponte dismissal of the juror was error, that event cannot supply manifest necessity for a mistrial. For that reason, we reverse the trial court's denial of Hunter's petition.

"A State may not put a defendant in jeopardy twice for the same offense." *Arizona v. Washington*, 434 U.S. 497, 502 (1978); *see also United States v. Newton*, 327 F.3d 17, 21 (1st Cir. 2003). "Because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendant's 'valued right to have his trial completed by a particular tribunal.'" *Washington*, 434 U.S. at 503. "As a general rule, after a jury has been impaneled and sworn, thus placing the defendant in jeopardy, double jeopardy bars a re-trial if the jury is discharged without reaching a verdict." *Fierro*, 79 S.W.3d at 56 (citing *Brown v. State*, 907 S.W.2d 835, 839 (Tex. Crim. App. 1995)); *see also Ex parte Lewis*, 219 S.W.3d 335, 353 (Tex. Crim. App. 2007) (double jeopardy generally prevents retrial once jury sworn). This ramification of the constitutional principle is grounded in the ideology that

> [e]ven if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unreasonable accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted.

*Washington*, 434 U.S. at 503–04 (referencing *United States v. Jorn*, 400 U.S. 470, 483 (1971) (plurality opinion); *Green v. United States*, 355 U.S. 184, 187–88 (1957); *Carsey v. United States*, 129 U.S. App. D.C. 205, 208–09 (1967)); *see Lewis*, 219 S.W.3d at 353 (noting consequence of double jeopardy jurisprudence is that occasionally, guilty person goes free).

"An exception to this rule exists when the defendant consents to a retrial or a mistrial is mandated by 'manifest necessity.'" *Fierro*, 79 S.W.3d at 56 (citing *Washington*, 434 U.S. 497); *see also United States v. Aguilar-Aranceta*, 957 F.2d 18, 22 (1st Cir. 1992). Such exceptions to the general prohibition against double jeopardy endure because there are many situations in which an accused's "valued right" to be tried before a particular tribunal should nonetheless be subordinated "to the public interest in affording the prosecutor one full and fair opportunity to present [the State's] evidence to an impartial jury." *Washington*, 434 U.S. at 505; *see also Downum v. United States*, 372 U.S. 734, 736 (1963) ("At times the valued right of a defendant to have his trial completed by a particular tribunal summoned to sit in judgment on him may be subordinated to the public interest—when there is an imperious necessity to do so."). Such subordination should occur, however, only when the appellate record supports the prosecutor's claim of "manifest necessity" that this important individual should bow to the public interest. *Washington*, 434 U.S. at 505; *Aguilar-Aranceta*, 957 F.2d at 22 (citing *United States v. Dinitz*, 424 U.S. 600, 608 (1976)).

Manifest necessity is, and should be, "limited to very extraordinary and striking circumstances." *Ex parte Little*, 887 S.W.2d 62, 65 (Tex. Crim. App. 1994). "There must be a 'high degree' of necessity that the trial come to an end." *Fierro*, 79 S.W.3d at 56 (citing *Torres v. State*, 614 S.W.2d 436, 442 (Tex. Crim. App. 1981)). The United States Supreme Court has declined to delineate rules or categories of circumstances in which manifest necessity exists, but such situations

are clearly limited to "very extraordinary and striking circumstances," according to the Court. *Downum*, 372 U.S. at 736.

To find manifest necessity, the trial court cannot simply make token reference to the various alternatives before ordering a mistrial; what is required of the trial court is that it "carefully and deliberately consider which of all the alternatives best balances the defendant's interest in having [the] trial concluded in a single proceeding with society's 'interest in fair trials designated to end in just judgments.'" *Brown*, 907 S.W.2d at 840 (quoting *Washington*, 434 U.S. at 516); *see also Sonnier v. State*, No. 14-92-00999-CR, 1995 Tex. App. LEXIS 2499, at *6 (Tex. App.—Houston [14th Dist.] Oct. 12, 1995, pet. ref'd) (not designated for publication). This deliberate consideration by the trial court of various alternatives, and the appropriate weights to be given to each of those alternatives when assessing those options, requires the trial court to conduct "more than a mere *pro forma* exercise to mask the trial judge's preferred course of action." *Brown*, 907 S.W.2d at 840. The trial court must always implicitly or explicitly choose the least drastic alternative to granting a mistrial; otherwise, the trial court abuses its discretion. *Id.*; *Little*, 887 S.W.2d at 66–67.

We are charged with the responsibility of reviewing the trial court's mistrial declaration,[6] to determine if manifest necessity required it. The following transcript, where the trial court considered the problem, provides us the key context for our review:

> THE COURT:     Let the record reflect we're outside the presence of the jury.
>
> At this time, the Court has determined that one of the jurors that is seated during this case was on the grand jury that originally indicted Mr. Hunter, and that case was dismissed, and then another grand jury indicted the case that we're presently trying.

---

[6]In double jeopardy appeals, the strictness of the reviewing court's scrutiny depends on the situation. If the State is somehow blameworthy, the appellate court applies the strictest appellate scrutiny. Such heightened review is required when, for example, the basis for the mistrial is the unavailability of prosecution evidence. *Washington*, 434 U.S. at 508. The same level of analytical inspection applies to situations in which there is reason to believe the prosecutor is using the State's superior resources to harass or otherwise achieve a tactical advantage over the defendant. *Id.* We perceive no State blame for this situation.

On the other hand, a deferential view of the trial court's decision to declare a mistrial is appropriate in situations in which either the defense was somehow blameworthy or there is no blame to lay at the feet of either party. There is generally no blame on a party when a jury is hung. In reviewing such cases, appellate courts are directed to accord "great deference" to the trial court's decision to declare a mistrial when the trial court believes the jury to be hopelessly deadlocked. *Id.* at 509–10. Similar leniency should be shown when the mistrial is the result of improper or prejudicial remarks made by the defendant or defense counsel. *Id.* at 510–11. In these situations, "the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." *Id.* at 511. Certainly, here, the presence of the problem juror was not caused by any blameworthy behavior by Hunter or his counsel. That arose through no apparent fault of either party. On the other hand, once the situation had arisen and the trial court seemed inclined to dismiss the problem juror, apparently to protect Hunter, Hunter's counsel could have attempted to keep that juror, had he wished to do so. He could have objected or even simply suggested retention of the juror, but remained mute. Thus, whether we view this as occurring wholly without the fault of either party, or occurring with some blame at the feet of Hunter, we should afford some measure of deference to the trial court's decision.

7

However, because of the fact that the facts are basically the same that the grand juror heard in the first indictment as opposed to the second indictment, then that juror is disqualified from participating in this case.

And as a result, there are two options. Those options are that the Court can, with the agreement of the parties, mis-try this case and try it at another date, or if both sides do not agree, the Court has no choice but to declare a mistrial, or the defendant may choose to have that juror excused and proceed with 11 jurors of which would be a unanimous verdict from 11.

However, I want to advise you, sir, that . . . you're entitled to be tried by 12 as opposed to 11.

Based on that statement by the Court, what does the State wish to move at this time?

[STATE]: The State makes no motion, your Honor.

[DEFENSE COUNSEL]: We make no motion, and I have asked him about going forward with 11, and he does not want to do that. He wants to go forward with 12 jurors.

THE COURT: And you do not want to also request a mistrial at this time?

[DEFENSE COUNSEL]: No.

THE COURT: Okay.

At that point, the entire jury[7] was brought in and the trial court announced that it was compelled to declare a mistrial.

_____

[7]Our reading of the record suggests that, until the mistrial was declared and the entire jury was discharged, the problem juror still sat with the jury and had not yet been dismissed. Nothing in the record suggests that the juror had actually formally been discharged or had physically left the scene.

Neither party challenged the problem juror for cause or objected to her. Instead, the effective challenge came from the trial court. Either the defendant or the State may challenge for cause a person who had served on the grand jury that indicted the accused. TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(7) (Vernon 2006). Challenges for cause are allowed under Article 35.16 based on the presumed or implied bias of a prospective juror who fits within one of the categories listed there. *See* TEX. CODE CRIM. PROC. ANN. 35.16 (Vernon 2006); *State v. Morales*, No. PD-0462-07, 2008 Tex. Crim. App. LEXIS 644, at *10 (Tex. Crim. App. May 14, 2008). While the problem juror here did not serve on the very same grand jury that returned the active indictment, she had served on a different grand jury that had returned the earlier, virtually identical indictment against Hunter.[8] We conclude she was challengeable for cause by a party. *See* TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(7).

Unless a prospective juror is absolutely disqualified from serving on the jury, the trial court should not, sua sponte, excuse him or her for cause. *Warren v. State*, 768 S.W.2d 300 (Tex. Crim. App. 1989); *Hawkins v. State*, 628 S.W.2d 71 (Tex. Crim. App. 1982). Such error is waived,

---

[8]We see little substantive difference between striking a juror who served on the grand jury that returned the indictment then on trial and striking a juror who served on the grand jury that returned a previous (but virtually identical) indictment that was later dismissed. In both cases, the trial court may rightfully presume that the juror, as a result of prior grand jury service, has formed an opinion adverse to the accused. *Webb v. State*, 232 S.W.3d 109, 113 (Tex. Crim. App. 2007); *Mitchell v. State*, 116 Tex. Crim. 65, 27 S.W.2d 800, 801 (1930); *Self v. State*, 39 Tex. Crim. 455, 47 S.W. 26, 28 (1898). In either case, the juror would be challengeable for cause.

however, if there is no objection to the court's sua sponte dismissal of a juror. *Cooks v. State*, 844 S.W.2d 697 (Tex. Crim. App. 1992); *Esquivel v. State*, 595 S.W.2d 516 (Tex. Crim. App. 1980).

Here, no party objected to the juror's dismissal or challenged the trial court's working premise that this particular juror could not continue. While, during the foregoing colloquy, Hunter clearly opted against completing the trial with only eleven of the existing jurors, and while he clearly elected to be tried by a jury of twelve members, he never explicitly said whether he wanted to be tried by the existing jury of twelve or a different jury of twelve. We believe, from the context of the discussion, he was opting to be tried later by a new jury of twelve; but that is not at all clear.

On appeal to this Court—and for the first time anywhere—Hunter asserts that one option available to the trial court in lieu of mistrial was to proceed to trial with the existing twelve jurors. At the time, the trial court appeared to believe it could not continue the trial with the existing twelve jurors—saying that she was "disqualified." Hunter did not suggest to the trial court that the juror could remain and serve, instead following the trial court's colloquy down the path to the court's logical conclusion: that a mistrial was required. Additionally, Hunter did not even suggest at the habeas hearing below that the challengeable juror could have continued her service. None objected to the trial court's discharge of the problem juror, either early in the colloquy when it was obvious the trial court intended to discharge her, or later in the colloquy when it declared a mistrial. Clearly, no error was preserved in connection with the juror's dismissal. But we must address the question

10

of whether the erroneous, though unpreserved, dismissal can support a finding that a mistrial became manifestly necessary as a result.

In *Fierro*, the parties discovered during trial that one of the jurors was a cousin of the accused, and the State challenged the juror for cause. Notably, Fierro stated on the record that he had no objection to the juror continuing to serve, though he interposed no objection to the juror's dismissal. *See Fierro*, 79 S.W.3d at 57. In spite of that, the trial court ruled that the juror was related within the third degree of consanguinity to the accused, a fact that, if true, would have made good the State's challenge for cause. *See* TEX. CODE CRIM. PROC. ANN. art. 35.16(b)(2). The trial court thereafter found "manifest necessity" existed for a mistrial. *See Fierro*, 79 S.W.3d at 55. After the intermediate appellate court affirmed the trial court's action, the Texas Court of Criminal Appeals reversed. By law, cousins are not related within the third degree of consanguinity, noted that court. *Id.* at 56; *see also* TEX. GOV'T CODE ANN. § 573.023(c) (Vernon 2004) (defining such relationships as those of parent and child, siblings, grandparent and grandchild, great-grandparent and great-grandchild, and aunts or uncles and nieces or nephews; list does not include cousins). Because the trial court erroneously determined the juror and the accused were related within the third degree, in spite of the fact that the error was not preserved with an objection, it followed that manifest necessity did not exist to declare the mistrial in that case. *Fierro*, 79 S.W.3d at 56–57. The court further noted that the trial court had failed to consider options less drastic than declaring a mistrial.[9] *Id.* at 57. The

---

[9]The trial court's options included, we note, the known option of keeping the juror as suggested by Fierro just before the trial court dismissed the juror.

11

court ruled that the trial court erred by denying Fierro's application for writ of habeas corpus based on double jeopardy grounds due to the absence of manifest necessity. *Id.*

We conclude *Fierro* is controlling precedent for us, though there are some differences between the case at hand and *Fierro*. In both cases, a decision to dismiss a juror led to a mistrial declaration. Also in both, the decision to dismiss the juror was error. In neither case was error preserved with an objection to the juror's dismissal. While *Fierro* dealt with a challenge for cause which was erroneously granted, the case before us is an erroneous, sua sponte dismissal of a juror who was challengeable for cause. But, in both cases, there was unpreserved error. The only real difference in these cases is that, in *Fierro*, after the State asked that the juror be dismissed for cause, Fierro stated that he had "no problem" with the juror, at least calling to the trial court's attention a possible alternative, keeping the juror. Central to our decision is whether that distinction actually makes a difference in whether a mistrial was manifestly necessary. We believe that, in light of *Fierro* and of the Constitutional dimensions imposed by the Double Jeopardy Clause, the distinction makes no difference.

We read *Fierro* to rule that an erroneous dismissal of a juror, which dismissal leads to a mistrial declaration, cannot provide support for a finding that the resulting mistrial was manifestly necessary. In *Fierro*, the erroneous decision to dismiss the juror was made without objection, though after it was at least suggested that the juror might be kept. Here, though the problem juror was subject to challenge for cause by either Hunter or the State, *see* TEX. CODE CRIM. PROC. ANN. art.

12

35.16(a)(7), neither party challenged her, objected to her dismissal, or suggested to the trial court that the juror could be kept. Because the dismissal was error, *Fierro* requires reversal to avoid putting Hunter in double jeopardy. Put another way, since the manifest-necessity threshold requires the trial court to explore all less drastic alternatives before declaring a mistrial, and the trial court did not consider the less drastic alternative of keeping the problem juror and continuing the trial with the then-constituted jury, manifest necessity did not require the mistrial. *See Fierro*, 79 S.W.3d at 57.

Two venerable United States Supreme Court cases parsing double jeopardy and manifest necessity could be argued as allowing Hunter's retrial, but we believe them to be distinguishable on key points.

In 1894, the United States Supreme Court decided a case strikingly similar to the one before us. *See Thompson v. United States*, 155 U.S. 271, 272–74 (1894). In *Thompson*, a murder case arising from the United States Federal District Court for the Western District of Arkansas, the trial court learned, in the midst of trial, that "one of the jury was disqualified by having been a member of the grand jury that found the indictment . . . ." *Id*. at 273. The Court stated that its rulings regarding double jeopardy claims had well established that

> courts of justice are invested with the authority to discharge a jury from giving any verdict, whenever in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated, and to order a trial by another jury; and that the defendant is not thereby twice put in jeopardy within the meaning of the 5th Amendment to the Constitution of the United States.

13

*Id.* at 274.  In *Thompson*, however, the Court termed the juror in question "disqualified," presumably under Arkansas law; distinguishing *Thompson* on that key point from the case before us, in which the questioned juror was, under Texas law, challengeable only—and stood unchallenged by a party. That is a telling difference.

In *Simmons v. United States*, 142 U.S. 148 (1891), a jury was empaneled and sworn to try a case involving embezzled funds.  During voir dire, the jurors had all stated they did not know the accused; during trial, however, it was discovered that one of the jurors knew the accused, was the accused's neighbor, and had a long-standing feud with the accused.  *Id.* at 148–49.  The trial court ordered a mistrial, stating,

> I am of the opinion that the facts presented make it necessary to discharge the present jury from further consideration of the case, in order to prevent the defeat of the ends of justice, and to preserve the rights of the people and also to preserve the rights of the accused to be tried by a jury, every member of which can render a verdict free from constraint.  It is manifest that the knowledge respecting the State made by [the witness who informed the court about the feud], conveyed to the jury by the publication of the letter of the defendant's counsel, makes it impossible that in the future consideration of this case by the jury there can be that true independence and freedom of action on the part of each juror which is necessary to a fair trial of the accused.

*Id.* at 150.  In affirming the trial court's denial of the accused's double jeopardy claim, Justice Gray, writing for the United States Supreme Court, noted,

> There can be no condition of things in which the necessity for the exercise of this power [to grant a mistrial] is more manifest, in order to prevent the defeat of the ends of public justice, than when it is made to appear to the court that, either by reason of facts existing when the jurors were sworn, but not then disclosed or known to the court, or by reason of outside influences brought to bear on the jury pending the trial,

14

the jurors or any of them are subject, to such bias or prejudice as not to stand impartial between the government and the accused. As was well said by *Mr. Justice* Curtis in a case very like that now before us, "It is an entire mistake to confound this discretionary authority of the court, to protect one part of the tribunal from corruption or prejudice, with the right of challenge alleged to a party. And it is, at least, equally a mistake to suppose that in a court of justice, either party can have a vested right to a corrupt or prejudiced juror, who is not fit to sit in judgment in the case." *United States v. Morris*, 1 Curt. 23, 37.

*Id.* at 155. In *Simmons*, however, the bias of the juror had been expressly established on the record.

Here, the bias of the problem juror was presumed only. That is a telling difference.

We believe the trial court was not consciously aware[10] that it had the option of keeping the

problem juror and thus continuing with Hunter's trial; it is clear that no one suggested that the juror

could be kept. But, because the record fails to show that manifest necessity supported the trial

court's declaration of a mistrial, double jeopardy bars the retrial of Hunter. We reverse the denial

---

[10]In some contexts, the trial court's awareness of options might be important. *See Brown*, 907 S.W.2d 835 (witness unavailable, mistrial declared).

> The record clearly reveals two less drastic alternatives which were available to the trial judge in lieu of a mistrial: (1) Beasley [the "unavailable" witness] was available to testify out-of-sequence on April 1 and could have been compelled by writ of attachment to remain throughout the trial, or (2) Valadez could have testified in Beasley's stead. The trial judge *was aware of these alternatives* but neglected to address them.

*Id.* at 843 (emphasis added). Here, though the alternative of keeping the juror was not uttered by anyone, we conclude that, in the face of Constitutional rights, the trial court here should have considered, sua sponte, the alternative of keeping the juror, even though no party suggested it. We believe *Fierro* requires that result.

15

of Hunter's application for writ of habeas corpus and remand this case to the trial court with instructions to grant Hunter's application. *See Fierro*, 79 S.W.3d at 57.


Josh R. Morriss, III
Chief Justice


DISSENTING OPINION

This case presents us with a circumstance in which a trial judge, in an effort to protect a defendant from any influence from a possibly tainted juror, dismissed (albeit erroneously) a seated juror after a trial had been commenced. The trial court then declared a mistrial. When the case was again set for trial, the defendant filed a pretrial application for writ of habeas corpus, alleging that to proceed once again to trial would violate his protections against being subject to double jeopardy pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, and similar protection afforded in Article I, Section 14 of the Texas Constitution. *See* U.S. CONST. art. 1, § 14.

The similarities between this case and *Ex parte Fierro*, 79 S.W.3d 54 (Tex. Crim. App. 2002), are striking. In both this case and in *Fierro*, after a trial had been commenced, a juror who had been seated was discovered to have potential conflicts and was disqualified sua sponte by the trial court; in fact, in each case, there was no statutory disqualification of the juror which actually did apply. In each of these cases, it is quite likely that on voir dire, a challenge for cause would have

16

been granted to exclude the juror. In both cases, the defendant's case was then called for trial again and in both circumstances, the defendant has attempted to interpose a claim of double jeopardy.

However, one should also examine the dissimilarities. In *Fierro*, the disadvantage posed by having the disqualified juror remain seated would presumably have been the State's and not the defendant's; here, the damage would have certainly been to Hunter. In *Fierro*, although there is no mention in the opinion that the defendant lodged a formal objection to the dismissal of the juror, it is noted specifically that "the juror was acceptable to the defense"; quite understandably, Hunter made no objection to the dismissal of the juror and made no representation to the trial court that the juror was acceptable.[11] Most importantly, the trial court in *Fierro* did not examine alternatives to the declaration of a mistrial; here, the trial court specifically sought the acquiescence of Hunter and the State to proceed with only eleven jurors, an alternative to mistrial which Hunter refused.

The Texas Court of Criminal Appeals indicated in *Fierro* that "[t]here is nothing in the record to demonstrate that the trial court considered any less drastic alternatives, as is required by *Brown*.

---

[11]Hunter, for the first time on appeal, indicates that he would, perhaps, have been willing to proceed to trial with the juror who had been disqualified by the trial court, an incredible proposition. When one considers that a grand juror hears a one-sided presentation of evidence (which does not necessarily meet the requirements of the Texas Rules of Evidence), almost any competent trial counsel representing Hunter would, of necessity, use every means possible to exclude such a potential juror from the panel. One imagines that a face-to-face representation by a defense counsel that he would have acquiesced to continuing with such a juror would almost necessarily be accompanied with an obvious wink and a broad smile or with eyes turned toward the ceiling and two fingers crossed behind the back.

One less drastic alternative would have been allowing that juror to serve on the jury." *Fierro*, 79

S.W.3d at 57. Later, the Texas Court of Criminal Appeals went further to explain that

> [t]he judge is required to consider and rule out "less drastic alternatives" before granting a mistrial. The judge must review the alternatives and choose the one which best preserves the defendant's "right to have his trial completed before a particular tribunal." The judge need not expressly state his reasons in the record as long as the basis for his ruling is adequately disclosed by the record. When a trial judge grants a mistrial despite the availability of a less drastic alternative, there is no manifest necessity and he abuses his discretion.

*Hill v. State*, 90 S.W.3d 308, 313 (Tex. Crim. App. 2002). Although the trial court here did not

entertain the idea of proceeding to trial with the apparently tainted juror,[12] it did consider and propose

a less drastic alternative to mistrial, an alternative which would have required the consent of both

Hunter and the State. When Hunter objected to this alternative, there was not then another option

known to or available to the trial court. Accordingly, quite extraordinary circumstances existed and

there was a "manifest necessity" that a mistrial be declared. *Ex parte Little*, 887 S.W.2d 62, 65 (Tex.

Crim. App. 1994).

Granted, as the majority has very accurately explained, the trial court's sua sponte dismissal

of the juror was error. Since the juror was not patently disqualified by statute or rule from serving

on the jury, the procedure to have been followed would have been to call this problem to the

attention of both counsel, determine (if necessary) whether the juror's grand jury service on Hunter's

---

[12]The record does not definitively state whether the questionable juror was still in attendance or not; the trial court said, "Let the record reflect that we're outside the presence of the jury. At this time, the Court has determined that one of the jurors that is seated during this case was on the grand jury that originally indicted Mr. Hunter. . . ."

18

matter would prejudice the juror sufficiently to warrant the juror's dismissal, and then act accordingly.  However, that error—standing alone— was not necessarily fatal, though it eventually led to the chain of events which precipitated the manifest necessity of the declaration of a mistrial.

With the circumstances at hand, one could likely presume that the trial court would have reasonably determined that proposing an agreement for the continuation of a trial with such a tainted juror would have been an exercise in futility; although no record was made of the discourse between the juror and the court to document the impact of prejudice on the juror, the practical effect could have been devastating to the object of conducting a fair trial.  Under the circumstances, there is no evidence that the trial court did not consider the possibility of proceeding to trial with that juror and, considering the type of taint the juror had explained and the certain and reasonable reservations any competent defense attorney would voice, believed that posing such a proposal to Hunter would have been fruitless.  Plainly, the actions of the trial court in dismissing the juror were motivated by a good-faith effort to protect Hunter's right to an impartial jury and a fair trial.  Hunter benefitted from it.  Had the trial court proceeded to trial with the tainted juror over the objection of Hunter and the trial resulted in a conviction, Hunter would probably be promptly before this Court arguing a perhaps strong case for reversal.

As the record before us reveals, the trial court did make the analysis it was required to perform in exploring the only alternative to mistrial:  proceed with eleven jurors.  When the

defendant refused to accede to a jury of less than twelve, the sole option to mistrial was foreclosed. Unable to proceed further, mistrial was dictated by manifest necessity.

Looking at the fact that the motivation of the trial court in having dismissed the juror was obviously for the purpose of protecting Hunter's rights and taking into account that he, indeed, explored the alternatives to the drastic remedy of mistrial, these two factors distinguish this case from *Fierro*.

The majority has a good, reasoned, comprehensive, and well-drafted opinion. However, I maintain that the interests of justice dictate a very narrow application of the precedent established by *Fierro*. When one places a narrow application of *Fierro*, it is not a precedent; it can be distinguished.

In a totally different context, the Texas Court of Criminal Appeals has recently repeated the maxim that "[t]he Constitution gives the defendant the right to a fair trial, not a perfect one." *Davis v. State*, 203 S.W.3d 845, 849 (Tex. Crim. App. 2006). The actions of the trial court to assure that Hunter was afforded a fair trial did not precipitate an injustice.

I would deny Hunter's plea.

Bailey C. Moseley
Justice

Date Submitted:    June 16, 2008
Date Decided:      June 17, 2008

Publish

21